HARRIET M. DAMON, ALLEN W. T. BOTTOMLEY, JAMES L. COCKBURN AND JOHN WATERHOUSE, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF SAMUEL M. DAMON, DECEASED, AND S. KURAMOTO, v. SHINJIRO TSUTSUI, HAWAIIAN LAND & IMPROVEMENT COMPANY, LIMITED, AND C. Q. YEE HOP COMPANY, LIMITED.

No. 1959.

ARGUED DECEMBER 8, 1930.  DECIDED DECEMBER 15, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a suit in equity brought by the complainants for the purpose of securing an injunction to restrain the respondent Tsutsui from catching shrimps in the portion of the sea known as the fishery of Kaliawa. Upon evidence adduced the circuit judge made and certified to this court the following findings of facts: "That the ili of Kaliawa, situate at Kalihi, Island of Oahu, was duly awarded to the heirs of George Beckley by Land Commission Award No. 818; that adjoining and appurtenant to said ili was and is the sea fishery of Kaliawa; that thereafter, in the year 1865, in a proceeding duly had for the purpose, a partition of said ili was made between the heirs of George Beckley whereby certain portions thereof, including the portion known as Panahaha and also the said fishery of Kaliawa were divided and set off to William Beckley, one of said heirs, as his sole and separate property; that, thereafter, the title to said portion of said land known as Panahaha and the said fishery of Kaliawa became vested in one Emma M. Beckley; that, thereupon, said Emma M. Beckley, by deed dated May 11, 1881, conveyed to one Gilbert Waller that portion of said ili of Kaliawa known as Panahaha, which said deed purported to reserve to the grantor all fishing rights in the sea adjoining, the same being the said fishery of Kaliawa; that by deed dated May

14, 1881, said Emma M. Beckley conveyed said fishery of Kaliawa to Luka Keelikolani; that the respondent C. Q. Yee Hop Company, Limited, now owns whatever title passed to said Gilbert Waller by said deed of May 11, 1881; that by an indenture dated October 9, 1929, said C. Q. Yee Hop Company, Limited, demised to S. Tsutsui, a respondent herein, a portion of said land of Panahaha; that employees of said S. Tsutsui, in the course of their employment have, on several occasions within a few months prior to the filing of the bill of complaint herein, caught and taken from said fishery of Kaliawa quantities of shrimp which said respondent S. Tsutsui has sold and retained the proceeds of sale; that the sole right of said S. Tsutsui to take said shrimp and sell the same depends upon his said lease from said C. Q. Yee Hop Company, Limited; that whatever title passed to said Luka Keelikolani by said deed of May 14, 1881, subsequently passed to one Samuel M. Damon and is now vested in the trustees under the will and of the estate of said Samuel M. Damon, complainants herein; that pursuant to proceedings duly brought by said Samuel M. Damon pursuant to the provisions of section 96 of the Organic Act of Hawaii a judgment was entered, in the form regularly used in such proceedings, on the 31st day of March, 1905, a copy of which is attached to the bill of complaint; that during the lifetime of said Samuel M. Damon he set apart for his own use and for sale from year to year pursuant to the provisions of law concerning fisheries (now chapter 56 of the Revised Laws of Hawaii, 1925) the fish known as amaama or mullet, and the same action has been taken by said trustees ever since the death of said Samuel M. Damon."

The following questions of law were reserved for the determination of this court: "1. Did Emma M. Beckley have the legal right to reserve in said deed to Gilbert

Waller, dated May 11, 1881, the fishing right appurtenant to said portion of the ili of Kaliawa known as Panahaha which would have passed to the grantee ·except for the reservation expressed in said deed? 2. Was such reservation effective to bind the land and the successors in title thereto of said Gilbert Waller? 3. If the said reservation was legally effective can the court in this proceeding require the respondent S. Tsutsui to account to the complainants for the value or proceeds of sale of the shrimp so taken as aforesaid from the fishery of Kaliawa?"

As appears from the findings made, the ili of Kaliawa was originally awarded to the heirs of George Beckley and they became the konohikis of that ili and of the sea fishery. As the result of a suit for partition a portion· of the ili of Kaliawa known as Panahaha and the whole of the sea fishery was set aside to William Beckley and became his sole and separate property. From William Beckley the land of Panahaha and the whole of the fishery of Kaliawa passed to Emma Beckley. From Emma Beckley the sea fishery passed by mesne conveyances to S. M. Damon and from him by his will to those of the present complainants who are his trustees. These trustees and complainants thus are now, by succession to William Beckley, the owners of the konohiki rights in the sea fishery of Kaliawa. Emma Beckley, by a deed executed in 1881, conveyed to G. J. Waller the land of Panahaha "with all easements, appurtenances, privileges and improvements to the same belonging," but by the same habendum "excepting and reserving, however, all fishing rights in the sea adjoining the said premises that may be supposed or ascertained to belong to the same." On August 18, 1911 (counsel have so stipulated), the land of Panahaha was conveyed to C. Q. Yee Hop & Company, one of the respondents, and that corporation, by lease dated October 9, 1929, de-

mised to Tsutsui, another respondent, a portion of the land of Panahaha.

A consideration, to some extent at least, of the subject of fishing rights in this Territory and in the Kingdom, its predecessor, becomes necessary. When Kamehameha I first brought all of the Hawaiian Islands into one kingdom the king was the owner of all of the fishing rights, just as he was the owner of all of the lands in the Kingdom. He did with each as he pleased, placing them in the keeping from time to time of chiefs and, under them, of the common people. In 1839 he made a redivision of the fisheries. As stated by the court in *Haalelea* v. *Montgomery,* 2 Haw. 62, 65, quoting from page 36 of the English version of the old laws printed at Lahainaluna in 1842: "His Majesty the King, hereby takes the fishing grounds from those who now possess them, from Hawaii to Kauai, and gives one portion of them to the common people, another portion to the landlords, and a portion he reserves to himself. These are the fishing grounds which His Majesty the King takes and gives to the people; the fishing grounds without the coral reef, viz: the Kilohee grounds, the Luhee ground, the Malolo ground, together with the ocean beyond. But the fishing grounds from the coral reefs to the sea beach are for the landlords, and for the tenants of their several lands, but not for others."

Continuing the statement by this court made in that case in 1858: "This is the point at which the existing piscatory regulations of the Kingdom had their commencement, and since which, ancient custom ceased to govern the subject. His Majesty Kamehameha III., as Supreme Lord of the Islands, and having in himself the *allodium* of all the lands in the Kingdom, did at that time, with the concurrence of the chiefs, resume the possession of all the fishing grounds within his dominions, for the purpose of making a new distribution thereof, and of regulating the

respective rights of all parties interested therein, according to written laws. The fishing rights of both the konohikis and the hoaainas were defined and regulated by the law of 1839, which was at different times amended in some particulars, until the passage of the organic Acts in 1846, when those rights were again defined by article 5th, of chapter 6th, part first, of the Act to organize the Executive Departments. (See 1st Vol. Stat. Laws, pp. 90 to 92, secs. 1 to 7.)"

The provisions as contained in the Organic Acts of 1846 are the same, with immaterial changes of phraseology, now to be found in sections 750 to 756, R. L. 1925. These latter read as follows: "Sec. 750. Konohiki rights. The fishing grounds from the reefs, and where there happen to be no reefs, from the distance of one geographical mile seaward to the beach at low water mark, shall, in law, be considered the private property of the konohikis, whose lands, by ancient regulation, belong to the same; in the possession of which private fisheries, the said konohikis shall not be molested, except to the extent of the reservations and prohibitions hereafter in this chapter set forth.

"Sec. 751. Tenants' rights. The konohikis shall be considered in law to hold said private fisheries for the equal use of themselves and of the tenants on their respective lands, and the tenants shall be at liberty to take from such fisheries, either for their own use, or for sale or exportation, but subject to the restrictions imposed by law, all fish, seaweed, shellfish and other edible products of such fisheries.

"Sec. 752. Konohikis' notice of tabu fish. The konohikis shall have power each year to set apart for themselves one given species or variety of fish natural to their respective fisheries, giving public notice, by viva voce proclamation, and by at least three written or printed notices posted in conspicuous places on the land, to their tenants

and others residing on their lands, signifying the kind and description of fish which they have chosen to be set apart for themselves.

"Sec. 753. Konohikis' tabu fish. The specific fish so set apart shall be exclusively for the use of the konohiki, if caught within the bounds of his fishery, and neither his tenants nor others shall be at liberty to appropriate such reserved fish to their private use, but when caught, such reserved fish shall be the property of the konohiki, for which he shall be at liberty to sue and recover the value from any person appropriating the same.

"Sec. 754. Restriction on konohikis' rights. The konohikis shall not have power to lay any tax, or to impose any other restriction, upon their tenants, regarding the private fisheries, than is in this chapter before prescribed, neither shall any such further restriction be valid.

"Sec. 755. Konohikis' right to prohibit fishing. It shall be competent to the konohikis, on consultation with the tenants of their lands, in lieu of setting apart some particular fish to their exclusive use, as in this chapter before allowed, to prohibit during certain months in the year, all fishing upon their fisheries; and, during the fishing season, to exact of each fisherman among the tenants, one-third part of all the fish taken upon their private fishing grounds. In every such case it shall be incumbent on the konohikis to give the notice prescribed in section 752.

"Sec. 756. Tabu fish free, where. If that species of fish which has been tabooed by any konohiki shall go on to the grounds which have been, or may be, given to the people, such fish shall not be tabooed thereon. It shall be tabooed only when caught within the bounds of the konohiki's private fishery. Nor shall it be lawful for a konohiki to taboo more than one kind of fish upon any fishing grounds which lie adjacent to each other."

Referring to the seven sections last here quoted, the

court said in the *Haalelea* case (pp. 66, 70-72) : "Under this statute, as we understand it, the entire fishing ground, lying between low water mark and the outer edge of the coral reef, (or Kuanalu, as it is called in the Hawaiian version) along the seaward front of the ahupuaa of 'Honouliuli,' was the private property of M. Kekauonohi, possessed and held by her as such, subject to the piscatorial rights of the tenants living on that ahupuaa. On this ground she has a common right of piscary with the tenants of 'Honouliuli,' or she was at liberty, if she saw fit, to taboo or set apart annually, one particular species of fish for her own private benefit, as provided in section 4th, or in lieu of this, she might on consultation with the tenants, as provided in section 7th, make an arrangement whereby she would be entitled to receive one-third part of all the fish caught on the ground." What was there said with reference to the fishery adjoining the ahupuaa of Honouliuli applies equally to the sea fishery adjacent to any other ahupuaa or ili. The following also was said by the court in the same case: "None of the rights of piscary possessed by M. Kekauonohi as owner of the fishery, could have passed as a mere appurtenance to the piece of land conveyed to Isaac Montgomery. She could have transferred the fishery, or her right therein, only by an express grant, *eo nomine*. Had she made a deed even of the whole ahupuaa, by metes and bounds, not including the fishery, nor expressly naming it in the conveyance, it is doubtful if either the fishery or her rights therein would have passed to the grantee.

"Again, if the grantor had conveyed the fishery, or her individual rights therein, by name, to Isaac Montgomery, that would not have conferred upon him the *exclusive* right which is now set up by the defendant, because M. Kekauonohi herself was not possessed of an exclusive right. It may even be doubted whether she could have

conveyed away the portion of the fishing ground lying opposite to Puuloa, or her special rights therein, so as to divide the fishery, without infringing on the rights of the tenants living on 'Honouliuli.' Certainly if her grantee had tabooed one kind of fish, on his part of the ground, while she tabooed another kind upon the other part, the rights of the tenants would have been violated. And if she could have divided the fishing ground into two parts, she could have divided into twenty, and so have rendered the rights of the tenants worthless.

"But, while we are clearly of the opinion that M. Kekauonohi did not convey any part of the fishing ground, or of her individual rights therein, to Isaac Montgomery, we are also of opinion that, when he received a conveyance of a portion of the ahupuaa of 'Honouliuli,' he acquired along with it a common right of piscary in the fishing ground adjacent. That is to say, he became, for the purposes of the law, governing this subject, a tenant of the ahupuaa, and as such entitled to take fish in the sea adjoining. We understand the word tenant, as used in this connection, to have lost its ancient restricted meaning, and to be almost synonymous, at the present time, with the word occupant, or occupier, and that every person occupying lawfully, any part of 'Honouliuli,' is a tenant within the meaning of the law. Those persons who formerly lived as tenants under the konohikis but who have acquired fee simple title to their *kuleanas,* under the operation of the land commission, continue to enjoy the same rights of piscary that they had as *hoaainas* under the old system. (See Joint Resolution on the subject of rights in lands, etc., vol. 2, Statute Laws, p. 70.) If any person who has acquired a *kuleana* on the ahupuaa of 'Honouliuli,' should sell and convey his land, or even a part of it, to another, a common right of piscary would pass to the grantee, as an appurtenance to the land. In that case it

would not be necessary, we apprehend, to mention the right of piscary in the conveyance—it would pass as an incident. (See Kent's Com. vol. 4, p. 517; Comyns' Digest, vol. 4, title Grant, E. 11.) Here, we think, is the great distinction between the rights of the konohiki, and those of the tenant or occupant, for, while the former holds the fishery as his private property, the latter has only a right of piscary therein, as an incident to his tenancy. This marked distinction in their respective rights must create a corresponding difference in regard to the transfer of those rights.

"As the conveyance by the owner of a *kuleana,* of a part of his land to another, would create such a tenancy in the grantee as would entitle him to a common right of piscary, so, in our opinion, the conveyance to Isaac Montgomery, by M. Kekauonohi, of a part of the ahupuaa, created such a tenancy, as carries with it, as an appurtenance thereto, under our laws, a common right of piscary; subject, always, to the rights of the grantor, and her legal representatives."

Any person who occupies lawfully, whether as grantee, lessee, tenant at will, or otherwise, any part of an ahupuaa or ili is a tenant within the meaning of these statutes. *Haalelea* v. *Montgomery, supra,* p. 71. Prior to becoming such an occupant no one is a "tenant" and every person once an occupant who ceases to be an occupant ceases to be a "tenant." When Waller purchased the land of Panahaha from Emma Beckley he became a tenant within the meaning of the law. When C. Q. Yee Hop & Company purchased, that corporation became a tenant. When Tsutsui received a lease of a portion of Panahaha he similarly became a tenant.

The plaintiffs contend that by reason of the language of the deed from Emma to Waller the latter did not acquire, or if he did he surrendered, any rights of fishery

which otherwise might have been his as a tenant of the land. The language referred to is that of the habendum that the grantor thereby excepted and reserved "all fishing rights in the sea adjoining the said premises that may be supposed or ascertained to belong to the same." The question at once suggests itself whether this was a mere reservation of something which belonged to Emma or was in addition a conveyance, surrender or release of something which belonged or was about to belong to Waller, and also whether, if the former, Emma could reserve anything more than her own konohiki rights in the fishery. Let it be assumed for the purposes of this opinion that the language quoted is properly to be construed as constituting not merely a reservation of Emma's fishing rights, but also a conveyance or release by Waller of all of the fishing rights which upon his becoming a tenant by the acceptance of the deed would have been his but for the release; or it may be assumed that the acceptance of the deed with the language of the habendum operated as an estoppel against any subsequent claim by Waller of any rights in the fishery. Still that leaves undetermined the question whether that same bar, by deed or by estoppel, operated against Waller's grantees and successors, to-wit, C. Q. Yee Hop & Company and Tsutsui. The latter question depends for its answer upon whether the tenants' rights in favor of the corporation and Tsutsui came to them by deed from their immediate grantor or predecessor or came to them by statutory grant. In our opinion each tenant in turn derived his fishing rights from the King or his successor, the Territory, by means of the statute. These fishing rights, as well as those known as konohiki rights, belonged originally to the King or government. It was theirs to distribute as they thought just. In making the redistribution of 1846 the King chose to give certain of the rights to the konohikis, certain of the rights to the tenants

and certain others (outside the reefs) to the people generally. In *Damon* v. *Hawaii,* 194 U. S. 154, 160, the petitioner's Royal Patent expressly conveyed to the petitioner fishing rights in the sea adjoining the ahupuaa. While the decision of the court was based upon that fact, nevertheless it discussed to some extent the statutes here under consideration and intimated very plainly that they constituted a grant of the fishing rights to the konohikis. It said, *inter alia:* "If the Hawaii statutes did not import a grant it is hard to see their meaning." In *Carter* v. *Hawaii,* 200 U. S. 255, 256, there was not any express grant by patent or deed to the petitioner and therefore the court was compelled to decide the question of the meaning of the statutes. It said: "We deem it unnecessary to repeat the ground of our intimation in the former case that the statutes there referred to created vested rights. We simply repeat that in our opinion such was their effect. The fact that they neither identified the specific grantees nor established the boundaries, is immaterial when their purport as a grant or confirmation is decided. It is enough that they afforded the means of identification, and that presumably the boundaries can be fixed by reference to existing facts, or the application of principles which have been laid down in cases of more or less similar kind."

But for this gift or grant the tenants would not have had any rights; and they have them only to the extent and with the limitations expressed in the grant. The tenant had "only a right of piscary, * * * *as an incident to his tenancy.*" *Haalelea* v. *Montgomery, supra,* p. 71. If a tenant sells or leases and moves away from the land he has nothing left (of what was granted him) to pass on to another tenant. The next tenant receives his rights through the statute, just as his immediate predecessor did. The konohikis were expressly disabled by the statute (section

754) from imposing any restrictions of their own upon the rights of the tenants. Similarly each tenant lacked the power, by the very nature of what was granted to him, to deprive any succeeding tenant of what the statute granted him. The release, therefore, by Waller, if there was any, and the estoppel, if any such resulted from the deed of Emma, did not operate to deprive C. Q. Yee Hop & Company or Tsutsui from acquiring or enjoying the fishing rights granted to tenants by the statute. A tenant had nothing of permanence which he could convey, his rights ceasing the moment he left the land. If the opposite were true and he could convey at all, he could convey to non-residents, without number,—which would be obviously contrary to the terms of the statute.

It is also contended by the plaintiffs that if in 1881, when Emma deeded to Waller, there were no tenants on Panahaha, Emma, the owner of Panahaha, had the right to convey to Waller upon the express understanding that he was not thereby to acquire any fishing rights as a tenant, the argument being that when each preexisting tenant ceased to be such the rights which he had accrued to the konohiki and that all of the fishing rights in the aggregate belonged irrevocably to the konohiki when there were no tenants. We do not so construe the statute of 1846. As already stated, the "tenants" who were thereby made possible beneficiaries of the law were not those only who were such when the law was passed in 1846, but included those also who thereafter from time to time might become tenants. If there was a time when on an ahupuaa or an ili there were no tenants, for the time being the konohiki by virtue of his rights was enabled to take all the fishes from the sea simply because there were no tenants to share them with him; but this was always subject to the requirement that when new tenants should appear they at once acquired the rights to fish which the statutes gave them

and the konohiki's rights were again in effect or in value thereby reduced *pro tanto*. Under this construction there is no violation of the principle, if that principle is at all applicable to such a case as this, that the title must be somewhere at all times. The title was in the konohiki when it was not in part in the tenants. We know of no reason or principle of law which would prevent a gift or grant, in these terms and with these qualifications, from the sovereign to his subjects, creating an estate or right in the konohikis more favorable or remunerative at some times than at others and, when there were no tenants, subject to open and let in other tenants when they should come into being.

There is, however, a reason why it must be held that Tsutsui, upon becoming a tenant, which was not until 1929, did not acquire any fishing rights. Section 95 of the Organic Act of Hawaii, which went into effect on April 30, 1900, provided as follows: "That all laws of the Republic of Hawaii which confer exclusive fishing rights upon any person or persons are hereby repealed and all fisheries in the sea waters of the Territory of Hawaii, not included in any fish pond or artificial inclosure, shall be free to all citizens of the United States, subject, however, to vested rights; but no such vested right shall be valid after three years from the taking effect of this Act unless established as hereinafter provided." Section 96 of the same Act reads: "That any person who claims a private right to any such fishery shall, within two years after the taking effect of this Act, file his petition in a circuit court of the Territory of Hawaii, setting forth his claim to such fishing right, service of which petition shall be made upon the attorney general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law.

"That if such fishing right be established the attorney

general of the Territory of Hawaii may proceed, in such manner as may be provided by law for the condemnation of property for public use, to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation, which compensation, when lawfully ascertained, shall be paid out of any money in the treasury of the Territory of Hawaii not otherwise appropriated." We understand that within the meaning of these two sections of the Organic Act the tenants' fishing rights were "exclusive." They excluded all persons except the konohiki. The public generally, as such, was excluded. The contention advanced by one of the attorneys for the respondents that none of these rights were exclusive except when there were no tenants on an ahupuaa or an ili and the konohiki was thus enabled, rightfully, to take all the fish in the fishery, cannot be supported. Its adoption would result in there being practically no exclusive fishing rights in this Territory upon which sections 95 and 96 could operate. The word was not used in the Organic Act in that sense.

The language of section 95 is entirely unambiguous. There can be no doubt that its intent was to repeal all laws of Hawaii which conferred exclusive fishing rights, including those of tenants, "subject, however, to vested rights," and that vested rights were not to be excepted or protected unless established judicially by proceedings instituted within two years from the date of the Organic Act. In the cases of those who were konohikis at the date of the Organic Act it has been held that their rights were "vested" within the meaning of that Act and suitable to be perpetuated by judicial decree. *Damon* v. *Territory* and *Carter* v. *Territory, supra.* Many such decrees were obtained by konohikis throughout the Territory within the time prescribed. It may be assumed that those persons who were "tenants" at the date of the Organic Act also

had "vested" rights, within the meaning of section 95, which would remain unaffected by the repeal contained in that section, provided only they were judicially established as there required. No proceedings whatever were instituted directly by any tenant subsequent to the passage of the Organic Act. In our opinion those persons who became tenants after April 30, 1900, as did Tsutsui in 1929, did not have any "vested" rights within the meaning of the Organic Act and therefore the repealing clause was operative as against them. As to them, the statutory provisions of 1846 amounted to nothing more than an offer to give them certain fishing rights when they should become tenants,—an offer which was withdrawn before they were in a position to accept it. When the repealing statute went into effect there had been no identification of the tenant or of the land or of the fishery. Under these circumstances it cannot properly be said that there had been any vesting. "Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right." 12 C. J. 955. "A mere expectancy of the future benefit, or a contingent interest in property founded upon anticipated continuance of existing laws, is not a vested right, and such right may be enlarged or abridged or entirely taken away by legislative enactment." 6 A. & E. Ency. L. 957. "Rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant, when they depend upon the continued existence of the present condition of things until the happening of some future event.

They are contingent, when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting." Cooley, Principles of Constitutional Law, 332, quoted with approval in *Pearsall* v. *Great Northern Railway,* 161 U. S. 646, 673.

It is argued on behalf of the respondents that the statutes of 1846 above quoted created the konohiki a trustee to hold the title to the fishery on behalf of all of the tenants on his lands as well as for himself, that when S. M. Damon, the konohiki of Kaliawa, of which Panahaha was a part, petitioned the court for an establishment of fishing rights he did so not only for himself but also for his tenants and that the decree which he obtained protected and perpetuated the tenants' rights as well as his own. The decree obtained by Mr. Damon reads as follows: "This action by petition claiming a vested right in and to the sea fishery of Kaliawa, Island of Oahu, and asking that the same might be established and awarded to plaintiff, came to the May, 1902, term of this court, and thence by continuance to the present term, when the parties appeared and were at issue to the court, jury being waived. The court having considered the evidence finds for the plaintiff, and it is hereby adjudged that the plaintiff has a vested right as owner of all that certain sea fishery, situated within the reef, the same not being a pond or artificial enclosure, in Kalihi, Island of Oahu, known as the 'kai o Kaliawa' or fishery of Kaliawa, bounded and described as follows:" (Here follows a detailed description, by metes and bounds, of the fishing grounds involved, concluding with the statement that the area was 290 acres.) "And it is hereby further adjudged that the plaintiff is entitled each year to set apart for himself for his sole and exclusive use within the fishing grounds within the metes and bounds above set out, one given species or variety of

fish natural to said fishery, giving public notice of the kind and description of the fish so chosen or set apart; and also to the right, in lieu of setting apart some particular fish to his exclusive use, to prohibit upon consultation with the tenants of his lands, all fishing upon the fishing grounds within the metes and bounds above set forth during certain months of the year; and during the fishing season to exact from each fisherman one-third of all the fish taken upon said fishing ground."

Assuming, without deciding, that konohikis were by the statute created trustees for the tenants and that Mr. Damon's decree protected the rights of the tenants of Kaliawa, it could only operate at most so as to protect the *vested rights* of such tenants. Neither Tsutsui nor C. Q. Yee Hop & Company was referred to, by name, in the decree. Neither was even in existence as a tenant when the decree was rendered (in 1905). The statute of Congress itself did not protect any rights other than those which were vested and by "vested rights" could only have been intended those which were vested at the date of the Act. The decree could not add to the rights of those who might thereafter become tenants. It could operate at best to preserve the class of rights which the statute excepted from its repealing effect, to-wit, rights then vested. Therefore, even assuming that the konohikis were trustees on behalf of the tenants, that Mr. Damon's suit was filed on behalf of his tenants as well as for himself, and that the decree could be deemed to operate in favor of the tenants, that of itself would still leave unsettled the question of whether the rights of Tsutsui and of C. Q. Yee Hop & Company were vested or were prevented by the repealing law from becoming vested.

The possibility of section 95 of the Organic Act being unconstitutional has been from time to time suggested by members of the bar of this court. None of the attorneys

in this case advanced the contention that it is unconstitutional. The court mentioned the subject from the bench at the final hearing, but counsel did not see fit to present any argument or to take any position on the subject. This possible question might well be disposed of upon the well established principle that a court ordinarily will not consider a question of constitutionality unless counsel points out the grounds of the alleged unconstitutionality. "It is not for the court to proceed to the discussion of so serious a matter as the constitutionality of a law unless its repugnancy to the constitution is pointed out by counsel." *King* v. *Joe,* 8 Haw. 287, 288. "A statute will not be declared void unless its invalidity is distinctly pointed out and clearly shown. * * * A court may properly decline to pass on a constitutional question in the absence of argument." 12 C. J. 785, 786. We prefer to add, however, that in so far as those tenants are concerned who became such after the date of the Organic Act (April 30, 1900), no reason appears for regarding the Act as unconstitutional. It expressly excepted vested rights. It repealed the laws of Hawaii only in so far as they might operate upon persons who had no vested rights. By this abolition no one was damaged and no one can justly complain of it. After April 30, 1900, the repealed laws were no longer in existence and no new rights could be created thereunder on behalf of persons becoming for the first time tenants. The fact remains, however, that the laws now repealed were in force and effect until April 30, 1900, and that certain rights became vested thereunder in konohikis and perhaps also in tenants who occupied the land before that date. (This latter point also we do not decide.) Whether the attempt by Congress (a) to require the establishment of vested rights by judicial proceedings within a stated time and (b) to declare those rights forfeited if not so established was constitutional, valid and

effective we need not consider or determine. Here again it may be assumed that it was unconstitutional,—for the clause containing that requirement and providing for the forfeiture is separable from the rest of section 95 and the remainder of that section can stand without it.. "A part of a statute may be unconstitutional and at the same time the remainder may be upheld as constitutional. The ordinary rule on this subject is that 'where the provisions are so interdependent that one may not operate without the other, or so related in substance and object that it is impossible to suppose that the legislature would have passed the one without the other, the whole must fall; but if, when the unconstitutional portion is stricken out, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained.' 26 A. & E. Ency. L. 570. As further defined by the Supreme Court of the United States in *Baldwin* v. *Franks,* 120 U. S. 678, 679, 'to give effect to the rule that when part of a statute is constitutional and part is unconstitutional that which is constitutional will, if possible, be enforced and that which is unconstitutional will be rejected, the two parts must be capable of separation so that each can be read by itself; limitation by construction is not separation.' * * * In other words, to say that a single word or expression used in a statute is unconstitutional when applied to certain facts or circumstances and constitutional when applied to other facts or circumstances would be to limit by construction and this would not be permissible; but if the parts are severable and if the part which remains can be enforced when standing by itself and still carry out the intent of the legislature, it can be upheld as constitutional." *Hawaiian Trust Co.* v. *Smith,* 31 Haw. 196, 202. To the same effect is *Territory* v. *Apa,* 28 Haw. 222, 227. "If, after striking out the unconstitutional part of a statute,

the residue is intelligible, complete and capable of execution, it will be upheld and enforced, except, of course, in cases where it is apparent that the rejected part was an inducement to the adoption of the remainder." *Territory* v. *Hoy Chong,* 21 Haw. 39, 43. The clause relating to proof of vested rights is severable from the rest of the section. There is no reason for supposing that Congress would not have passed the remainder of section 95 if it had been informed that it had not the power to require proof of vested rights on pain of forfeiture. It was desirous of rendering fisheries in Hawaii, like those on the mainland, free to the public and substantial progress towards that end would be accomplished by preventing the accrual of any new rights of tenants and at the same time providing for the condemnation of existing or vested rights·

It may be added that C. Q. Yee Hop & Company and Tsutsui, neither of whom had any vested rights in 1900, are not in a position to question the constitutionality of the requirement of section 95 that those who did have vested rights should prove them judicially. *In re Craig,* 20 Haw. 483, 490; *Territory* v. *Miguel,* 18 Haw. 402, 404; *Territory* v. *McVeagh,* 23 Haw. 176, 178, 179.

By taking shrimps in the fishery of Kaliawa, Tsutsui encroached upon the rights of other tenants only, if there were other tenants who had acquired rights prior to April 30, 1900, during the period or periods when the plaintiffs had set apart the amaama for themselves. He encroached upon the rights of the konohikis during the period or periods when they chose to exercise the right to one-third of the catch made by the tenants and so also he encroached upon the rights of the konohikis if there were no other tenants on the land at the time of his trespass, for during those last mentioned times the shrimps belonged to the konohikis.

The first question reserved is not answered. The second is answered in the negative. The answer to the third is that the court of equity has jurisdiction in this proceeding to award damages provided, within the principles above stated, the plaintiffs have been injured.

*A. G. M. Robertson* (*Robertson & Castle* on the brief) for complainants.

*J. L. Coke* (also on the briefs) for Shinjiro Tsutsui and C. Q. Yee Hop Co.

*M. E. Winn* (*Thompson, Beebe & Winn* on the brief) amicus curiae.