This case comes to this court upon an appeal from a judgment entered in the circuit court of the fifth judicial circuit of the Territory of Hawaii.
The action was one in eminent domain to condemn for the use of the citizens of the United States of America the private fishing rights in the sea fisheries at Nawiliwili and Niumalu. Private fishing rights were established by the predecessor in title of the Bishop Trust Company, Limited, Trustee, in these fisheries by judgment rendered in the circuit court of the first judicial circuit in 1911 in a proceeding pursuant to section 95 of the Organic Act[1] providing that any person claiming a private fishing right shall within two years after the taking effect of the Organic Act file his petition to establish such right in the circuit court of the Territory of Hawaii.
Plaintiff, pursuant to section 96 of the Organic Act,[2]
sought to condemn the fishing rights so established of Bishop Trust Company, Limited, Trustee of the Estate of *Page 360 
Kaleipua Kanoa, and of others joined as defendants. The only other person appearing besides the Bishop Trust Company, Limited, Trustee, was one Joseph Lovell and judgment on the pleadings was rendered for the Territory against Joseph Lovell; litigation thereafter was solely between the plaintiff and Bishop Trust Company, Limited, Trustee.
In its answer the defendant claimed it is the sole owner of the sea fisheries sought to be condemned and denied any other person can claim an interest in the award upon the condemnation of the fisheries. Plaintiff admitted that defendant as successor-trustee of the Kaleipua Estate is the owner of the fisheries established by that judgment of 1911. It was agreed that defendant owns what has commonly been called konohiki rights to the fisheries.
Prior to the selection of the jury the two parties raised an issue of law which was presented to and determined by the judge before any evidence pertaining to the value of the fisheries was given in the action.
The plaintiff-appellant contends that the statutes governing fishing rights conferred only rights of a user and that they "did not bestow ownership of the inshore fishing areas upon thekonohiki"; that at the time the 1846 statute was passed, persons had merely rights in land and there was no "fee" ownership; that the holdings of the king were the closest to being a fee, but that even his ownership was subject to the rights of others, quoting from "Exposition of Principles on which the Present Dynasty is Founded," Constitution of 1840.
It is undoubtedly true that from the most ancient times even absolute monarchs in all countries were bound by and observed certain customs of the peoples and religious doctrines and such was undoubtedly the fact in Hawaii.
Plaintiff-appellant in its argument makes the contention that the words "private property" are not a correct *Page 361 
translation of the words "ua pili i" appearing in the Hawaiian version of the Act of 1846 and that at that time the Hawaiian version controlled the English, that this translator's error has appeared in all of the statutes since that time. Plaintiff-appellant further contends that the konohiki's right is only an alternative right, either to taboo one species of fish for its exclusive use or to declare open and closed fishing seasons and to take one third of the catch made during the open season, and that there is no basis in law for enlarging thekonohiki's rights into an exclusive right to all of the fish in the fishery.
On the other hand, the defendant claims the konohiki held the fishery as his "private property" subject only to the rights of the hoaainas (tenants of the konohiki) therein, and thekonohiki had the right to exclude all persons except suchhoaainas from the fishery.
As the fishing rights were so intimately related to the system of the land titles and rights in land, a partial discussion of the ownership and rights in lands is necessary in a consideration of the rights to fisheries.
As stated in the "Principles Adopted by Land Commission," Laws of 1847, under the ancient Hawaiian system all land belonged to the king or ruling chief who allotted tracts of land from time to time to the principal chiefs, subject to revocation at will; upon the death of the king each principal chief derived his lands anew, gave them out to an inferior order of chiefs or first of rank, by whom they were subdivided again and again from the king down to the lowest class of tenants.
The unit of land was the ahupuaa, usually running from the mountains to the sea. Within the ahupuaa were a number of subdivisions, each of which was called an ili. This division was for the convenience of the chief, administered by akonohiki or agent appointed by the chief. (It is only in the later statutes that the chiefs or landlords *Page 362 
are referred to as konohikis.) It had no existence separate from that of the ahupuaa, except the so-called ili ku or independent ili, although the independent ili paid tribute to the king. There were also kuleanas, meaning a tract of land within the larger tract. The term kuleana originally referred to a right of property in any business or other matter but afterwards was applied to the land holding of the tenant orhoaaina residing in the ahupuaa.
The tenure of Hawaiian land was feudal in many respects except it was not based on military service but upon a system of labor upon the chief's lands, ordinarily once a week (patches cultivated for the chief were originally called keele orhakuone; in later times they were called paolima, that is, Fridays, due to the fact that the tenants were obliged to labor for a chief on Fridays), and the paying of a portion of the products of the land held by them to the king as a form of taxation (as a rule, labor on the king's lands on Tuesdays). There was also this difference from the feudal system, the common people were mere tenants at will, liable to be dispossessed at any time, nor were they bound to the lands but could change their residence from one district to another.
In the early days the chiefs lived on the lands, personally attended to their cultivation, and took a deep interest in the prosperity of their tenants, but with the centralizing of authority and the coming of the white men and their luxuries, the chiefs were drawn away from their lands and were succeeded by agents or konohikis and the old feudal ties of service and affection gradually lost their power.
After this coming of the white man complications arose over land questions; remedial legislation began in 1839 and was brought to a climax during the decade following the adoption of the Constitution of 1840.
The rights of the chiefs and others were based upon *Page 363 
what we might term the old Hawaiian customs or laws. It is true there were no written laws in prehistoric days for there was no written language, but the customs both as to lands and fishing rights were regulated in a very complete manner and the boundaries of every division of land were well known.
"With the Hawaiians, from prehistoric times, every portion of the land constituting these Islands was included in some division, larger or smaller which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood. Some persons were specially taught and made the repositories of this knowledge, and it was carefully delivered from father to son.
"The divisions of the lands were to a great extent made on rational lines, following a ridge, the bottom of a ravine or depression, but they were often without these and sometimes in disregard of them. Sometimes a stone or rock known to the aboriginals and notable from some tradition, or sacred uses, marks a corner or determines a line. The line of growth of a certain kind of tree, herb or grass, the habitat of a certain kind of bird, sometimes made a division. * * *
"A principle very largely obtaining in these divisions of territory was that a land should run from the sea to the mountains, thus affording to the chief and his people a fishery residence at the warm seaside, together with the products of the high lands, such as fuel, canoe timber, mountain birds, and the right of way to the same, and all the varied products of the intermediate land as might be suitable to the soil and climate or the different altitudes from sea soil to mountainside or top. * * *" (Boundaries of Pulehunui, 4 Haw. 239, 240-242.)
As previously stated, the term kuleana originally meant a property or business interest in anything. The common people were in early times assigned portions of the *Page 364 
chief's lands to occupy at the will of the chief, although there was as a rule a certain degree of permanency in this occupancy where the services were duly rendered to the chief. But when the chief's agents, the konohikis, began to abuse and exploit the tenant, statutes were enacted to protect the tenant in his ancient rights.
In 1839 a law was promulgated that no one should be deprived of his land without due cause. This was the forerunner of the land laws culminating in the mahele or division between the king, the chiefs and the common people.
Without giving in detail the various statutes, we have the "Act to Organize the Executive Departments" passed in 1846 which provided for the appointment of a "Board of Commissioners to Quiet Titles." These commissioners investigated the titles toahupuaas and usually awarded them (by name only) to the chiefs, now called the konohikis, subject to the rights of the tenants who were enabled by the Act to prove their rights and obtain fee-simple titles to kuleanas, the lands which they had occupied under more or less permissive use from the konohiki.
We thus have in the middle of the last century for the first time titles in fee to lands and fisheries appurtenant thereto settled by land commissioners. In this connection, the fisheries in some instances were deemed more important than the land of theahupuaa and the lands were referred to as appurtenant to the fisheries. This was particularly true on the islands of Kauai and Niihau. See section II of article V of chapter VI of the Laws of 1845-46, providing: "The fishing grounds from the reefs, and where there happen to be no reefs from distance of one geographical mile seaward to the beach at low water mark, shall in law be considered the private property of the landlords whoselands, by ancient regulation, belong to the same; in the possession of which private fisheries, the *Page 365 
said landholders shall not be molested except to the extent of the reservations and prohibitions hereinafter set forth." (Emphasis added.)
The statute on private fishing rights is contained in sections 1201 to and including 1214, Revised Laws of Hawaii 1945. The section with which we are most concerned is section 1204 which reads as follows: "The fishing grounds from the reefs and where there happen to be no reefs, from the distance of one geographical mile seaward to the beach at low water mark, shall, in law, be considered the private property of the konohikis, whose lands, by ancient regulation, belong to the same; in thepossession of which private fisheries, the konohikis shall not bemolested, except to the extent of the reservations andprohibitions hereafter in this chapter set forth." (Emphasis added.)
Prior to the enactment of any statutory provisions Kamehameha III redistributed the fisheries. As stated by Mr. Justice Holmes in Damon v. Hawaii, 194 U.S. 154, 158: "In 1839 Kamehameha III took the fishing grounds from Hawaii to Kauai and redistributed them — those named without the coral reef, and the ocean beyond, to the people — those `from the coral reef to the seabeach for the landlords and for the tenants of their several lands, but not for others.' The landlord referred to seems to have been the konohiki or overlord of an ahupuaa or large tract like that owned by the plaintiff. It is not necessary to speculate as to what the effect of this act of the king would have been, standing alone, he then having absolute power. It had at least the effect of inaugurating a system, de facto."
(Emphasis added.)
To quote from the laws enacted subsequent to Kamehameha's proclamation, section 8 of chapter III of the Laws of 1842 relative to fishing contains, among others, the following provisions:
"His majesty the King hereby takes the fishing grounds *Page 366 
from those who now possess them, from Hawaii to Kauai, and gives one portion of them to the common people, another portion to the landlords, and a portion he reserves to himself.
"These are the fishing grounds which his Majesty the King takes and gives to the people; the fishing grounds without the coral reef, viz. the Kilohee grounds, the Luhee ground, the Malolo ground, together with the ocean beyond.
"But the fishing ground from the coral reefs to the sea beach are for the landlords, and for the tenants of their several lands, but not for others. * * *" (Emphasis added.)
Then follows the provision relative to the right of the landlord to taboo one fish after due notice to the tenants, etc.
The provision relative to the fishing rights is contained in the Code of 1859, sections 384 to 396 inclusive. It will be noted that sections 387, 388 and 389 of the Code of 1859 are in the same wording as sections 1204, 1205 and 1206 of the Revised Laws of Hawaii 1945. Further, section 392 of the Code relative to thekonohiki's rights, in consultation with tenants of the lands, in lieu of setting aside a particular fish to his exclusive use, may prohibit all fishing during certain seasons, and during the fishing season may exact of each fisherman among the tenants one third of all the fish taken upon the konohiki's grounds, is repeated in section 1209 of the Revised Laws of Hawaii 1945.
In the plaintiff-appellant's contention that the words "private property" are not a correct translation of the Hawaiian version"ua pili i" appearing in the Hawaiian version of the Act of 1846 and at that time the Hawaiian version controlled the English, we might point out that the same translation appears in the Civil Code of 1859.
Section 1493 of the Code of 1859 specifically provides that if a difference shall be found to exist between the *Page 367 
English and the Hawaiian versions of the Code, the English version controls. (See also R.L.H. 1945, § 8, to same effect.)
While this court takes judicial notice of the Hawaiian language and may resort to the employment of experts and dictionaries in arriving at the meaning of a law or document in Hawaiian (In ReTitle of Pa Pelekane, 21 Haw. 175; Hapai v. Brown, 21 Haw. 499), in view of the enactment in the Code of 1859 and the several Revised Laws enacted thereafter up to and including those of 1945 wherein the fishery is described as the "private property" of the konohiki, we feel it would be presumptuous of this court with its limited knowledge of Hawaiian to attempt after 97 years to give a different interpretation even with the aid of experts and dictionaries. Further, it is well settled that the reenactment by the legislature of a law after the courts have given judicial interpretation of any provision in such statutes constitutes approval thereof. (Collins v. Ako, 35 Haw. 440.) Also, construction by officers of the government dealing with the statute is entitled to great weight.
"It is well settled that courts `give great weight in a doubtful case to the contemporaneous and unvarying construction put upon a statute by all persons dealing under it.'" (Pasquoin
v. Sanders, 20 Haw. 352, 354.)
See also Thurston v. Bishop, 7 Haw. 421, 432, stating that the court is not at liberty to disregard the construction placed upon a statute where the legislative power of the kingdom, the king and the nobles and representatives, and uniformly concurred in and acted upon by successive governments under many reigns following, and to this day, undisturbed by any judicial decisions.
Again, if we examine the Hawaiian decisions from Haalelea v.Montgomery, 2 Haw. 62, to Damon v. Tsutsui, 31 Haw. 678, we arrive at the uniform conclusion that the *Page 368 
Act means what it says, that is, the fishery is a "private property" of the konohiki, subject only to the limitations thereinafter set out in the statute conferring rights onhoaainas or tenants.
The first paragraph of the syllabus in the case of Haalelea
v. Montgomery, 2 Haw. 62, states: "By the laws of 1839, as subsequently amended by the organic acts of 1846, the entire fishing ground, lying between low water mark and the outer edge of the coral reef, or kuanalu, along the seaward front of anahupuaa of land, is the private property of the landlord or konohiki, subject always to certain piscatorial rights of the tenants or hoaainas." (Emphasis added.)
In Oni v. Meek, 2 Haw. 87, 88, 95, it was held it was not within the power of the konohiki to alienate a single right conferred by law to the tenant, that the term people as used in the Act of 1850 was held to be synonymous with the term tenants as used in the law relating to private fisheries.
Hatton v. Piopio, 6 Haw. 334, held that every resident tenant on a land has the right to fish in the sea appurtenant to the land and sell the fish caught by him. In this case a subtenant had caught and sold certain fish which were not taboo.
Damon v. Hawaii has been referred to heretofore and likewise Carter v. Hawaii, both holding that these fishing rights held by the konohiki were vested and exclusive, subject to the rights of the tenants.
Smith v. Laamea, 29 Haw. 750, held that a person occupying lawfully any part of an ahupuaa is a tenant within the meaning of the law and is entitled to a right of piscary in the sea adjoining in common with others subject always to the rights of the konohiki in the fishery.
Damon v. Tsutsui, 31 Haw. 678, held that any lawful occupant of a part of an ahupuaa or an ili is a tenant of *Page 369 
such ahupuaa and had a right to fish; that every succeeding tenant of an ahupuaa derived his fishing rights from the statute and not from his grantor or lessor of the land occupied by him, and that a deed of estoppel which may operate to bar one tenant from claiming or exercising his fishing rights in a sea fishery does not of itself bar any succeeding tenant of the same land or a part thereof; that section 95 of the Organic Act repeals all laws of Hawaii which conferred exclusive fishing rights upon any person or persons, subject only to vested rights.
The cases hold without any dissent that a konohiki has the right to exclude persons other than hoaainas (tenants of theahupuaa) fishing in the fishery, and the Tsutsui case expressly holds that the konohiki himself has the right to fish and exclude those who are not tenants from fishing.
As stated in that case, "If there was a time when on an ahupuaa or an ili there were no tenants, for the time being the konohiki by virtue of his rights was enabled to take all the fishes from the sea simply because there were no tenants to share them with him; * * *" (31 Haw. 690.)
In the opinion of Attorney General Stanley to the legislature in 1874, the following statement appears:
"And here is the great distinction between the rights of the konohiki and those of the tenant or occupant, for while thekonohiki holds the fishery as his private property, the tenant has only a right of piscary therein, as an incident to his tenancy." (Emphasis added.)
The argument that the konohiki must taboo one fish or elect to take a third of the catch is meaningless as to one third of the catch if there are no tenants, because there will be no catch except the catch made by the konohiki himself. If one third only goes to the konohiki, where does the other two thirds go — not to the public because the public has no rights in the fishery and may be excluded according to the provisions of the statute and the decisions over a *Page 370 
period of years, particularly Damon v. Tsutsui, supra.
Since at least 1859 the Hawaiian statutes (Civil Code 1859, § 387; R.L.H. 1925, § 750; R.L.H. 1935, § 354; R.L.H. 1945, § 1204) and the decisions of the Hawaiian courts since Haalelea v.Montgomery, supra, and the United States Supreme Court inDamon v. Hawaii and Carter v. Hawaii, supra, have recognized that the fishing grounds are "the private property of the konohikis, whose lands, by ancient regulation, belong to the same; in the possession of which private fisheries, the konohikis shall not be molested, except to the extent of the reservations and prohibitions hereafter in this chapter set forth."
This right is subject only to the rights of the tenants of theahupuaa to take fish. (Civil Code 1859, §§ 388, 389, 390; R.L.H. 1945, §§ 1205, 1206, 1207.)
The privilege of taking fish does not destroy the fee-simple ownership of the konohiki but is in the nature of a profit aprendre.
The judgment of the court below is affirmed.
[1] "Sec. 95. Repeal of laws conferring exclusive fishingrights. That all laws of the Republic of Hawaii which confer exclusive fishing rights upon any person or persons are hereby repealed, and all fisheries in the sea waters of the Territory of Hawaii not included in any fish pond or artificial inclosure shall be free to all citizens of the United States, subject, however, to vested rights; but no such vested right shall be valid after three years from the taking effect of this Act unless established as hereinafter provided. [48 U.S.C.A. 506.]"
[2] "Sec. 96. Proceedings for opening fisheries to citizens.
That any person who claims a private right to any such fishery shall, within two years after the taking effect of this Act, file his petition in a circuit court of the Territory of Hawaii, setting forth his claim to such fishing right, service of which petition shall be made upon the attorney-general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law.
"That if such fishing right be established the attorney-general of the Territory of Hawaii may proceed, in such manner as may be provided by law for the condemnation of property for public use, to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation, which compensation, when lawfully ascertained, shall be paid out of any money in the treasury of the Territory of Hawaii not otherwise appropriated. [48 U.S.C.A. 507.]"