CHARLES F. REPPUN, PAUL REPPUN, ROBERT S. NAKATA, and SEIYU NAKATA, Plaintiffs-Appellees, Cross-Appellants, and CLIFFORD WONG and RACHEL HALL, Plaintiffs-Intervenors-Appellees, Cross-Appellants, *v.* BOARD OF WATER SUPPLY, City and County of Honolulu, Defendant-Appellant, Cross-Appellee

NO. 7738

(CIVIL NO. 50121)

DECEMBER 20, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ., AND RETIRED JUSTICES OGATA AND MENOR, ASSIGNED TEMPORARILY

OPINION OF THE COURT BY RICHARDSON, C.J.

Both plaintiffs and defendants in this appeal contest the judgment of the trial court enjoining the Board of Water Supply of the City and County of Honolulu from reducing the flow of the Waihee stream below 2.7 million gallons per day. They essentially aver that the trial court misapplied the law governing water rights in our state as delineated in *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 504 P.2d 1330, *aff'd upon rehearing*, 55 Haw. 260, 517 P.2d 26 (1973) (*cert. denied*, 417 U.S. 976, *appeal dismissed*, 417 U.S. 962 (1974) (hereinafter *McBryde*). The Board, however, also asserts *McBryde* is an aberration that must be overruled. We have re-examined our deci-

sion and are still convinced it represents a correct statement of the law governing water rights in Hawaii. But we find the trial court misapplied the precepts enunciated there. We therefore reverse the judgment of the trial court and remand the case.

## I. INTRODUCTION

The geological structure of the Koolau mountains of Oahu enables parts thereof to act as natural reservoirs of fresh water; these natural storage compartments are called dike complexes or systems. The seepage and overflow from one such dike complex or system serve as the primary source of the Waihee stream. Competing claims to the waters of the stream and competing ownership claims to the waters at its source are advanced in this appeal.

The Board of Water Supply of the City and County of Honolulu (hereinafter BWS) maintains a tunnel and inclined shafts to facilitate the withdrawal of water from the Waihee dike system; it also pumps water therefrom. This substantial withdrawal of water by the BWS naturally diminishes the flow of the Waihee stream. Six taro farmers who claim appurtenant and riparian rights to the waters of the stream initiated this case, alleging that they are entitled at least to a flow of water sufficient to maintain their crops. Conversely, the BWS claims its predecessor in interest purchased the bulk of the rights to the waters in question. It contends the withdrawals of water cannot be deemed a legal wrong subject to injunction since it draws water from the underground source rather than the stream. It further asserts that the "public use doctrine" precludes the issuance of an injunction here.

## II. STATEMENT OF THE CASE

The natural flow of the Waihee stream is approximately 6 to 8 million gallons per day (mgd). In 1955 the BWS[1] drilled a tunnel into the dike system feeding the stream. Water was subsequently

---

[1] The Honolulu Board of Water Supply is a duly authorized department of the City and County of Honolulu, a municipal corporation of the State of Hawaii. It is empowered to construct, operate and maintain the water systems of the city and county and acquire property and water rights for these systems.

withdrawn via the tunnel, thereby reducing the stream flow to approximately 4 mgd. In 1974 and 1976 the BWS increased the amount of withdrawable water by constructing inclined wells and pumping water from the dike system. When the wells were operative the flow of the Waihee stream was reduced to a summer average of 2.3 mgd in 1975 and 2.03 mgd in 1976.

The plaintiffs utilize the waters of the Waihee stream to irrigate their crops. Their method of irrigation involves a diversion of the waters from the stream to flood and flow through their taro[2] patches or lois, which approximates the traditional means of taro cultivation.[3] Until 1975 the stream's flow was sufficient to satisfy their needs. However, in the summer of 1975, one of the farmers sustained crop losses from a fungal growth known as pythium[4] that causes rot in the root or corm of the taro plants. In subsequent years all the plaintiffs save one suffered losses attributable to pythium. Plaintiffs believed, and the trial court subsequently agreed, that the proliferation of pythium was related to the diminution of the flow of the Waihee stream, as the spread of the fungus can be retarded or halted by a flow of cool fresh water through the taro lois and such a flow was rendered impossible by the actions of the BWS. This suit was therefore initiated in 1976 to enjoin the BWS from diverting any of the stream's waters.[5]

---

[2] "Taro (Colocasia escylenta) is a kind of aroid cultivated since ancient times for food spreading widely from the tropics of the Old World. In Hawaii taro has been the staple from earliest times . . . and its culture developed greatly including more than 300 forms. All parts of the plant are eaten, its starch root principally as *poi*, and its leaves as *lu'au*. It is a perennial herb consisting of a cluster of long-stemmed, heart shaped leaves rising a foot or more from underground tubers or corms." Pukui & Elbert, *Hawaiian Dictionary*, 115 (1971).

[3] As to the traditional means of cultivating wet land taro see, Handy & Handy, *Native Planters in Old Hawaii*, 90-102 (1972).

[4] Pythium infestation causes "the transformation of the normally firm flesh of the corm into a soft, mushy, often evil-smelling mass, unfit for human consumption." Parris, Diseases of Taro in Hawaii and their Control, 9 (1941).

[5] Plaintiffs also claim to be entitled to injunctive relief because of alleged BWS violations of various environmental statutes and regulations. Each of these claims were either dismissed or remanded by the trial court. We see no basis for reversing the trial court on these matters.

## A.

The plaintiffs' claims to the waters of the Waihee stream stem from their status as landowners or lessees of riparian lands and from the fact that much of their lands were devoted to the cultivation of taro at the time of the Great Mahele, when the lands were granted in fee to their occupants. They assert they are thus entitled to 1) riparian rights to the natural flow of the Waihee stream, and 2) appurtenant rights to water required in the cultivation of taro on all lands that were being utilized for such purpose at the time of the Mahele.

The BWS counters by claiming it purchased virtually all of the rights now being asserted by plaintiffs. This claim, which also has its genesis in the Great Mahele, may be summarized as follows:

(1) In 1848 the system under which lands were held in the Kingdom of Hawaii was converted from one where title to all land was held by the King in trust for the people to one where fee simple ownership was recognized. The bulk of the ahupuaa of Waihee was set aside by the Mahele as crown lands, *i.e.*, as part of the King's private property, but each of these grants was made "subject . . . to the rights of tenants."

(2) In 1855 most of the ahupuaa was conveyed to Benjamin Parker. Subsequently, Bishop Trust Company, as trustee for Kahaluu Land Trust, acquired title to Parker's interests in the ahupuaa. This covered most of the property currently owned or leased by the plaintiffs in Waihee.

(3) In 1950, Bishop Trust transferred by deed "all the right, title and interest of the Grantor to water having its source upon or flowing under or over the land [held by Bishop Trust] . . . and all easements or rights in the nature of easements to the continuous or interrupted flow of water, ditches and auwais on said land" to the Koolau Company. The deed also transferred to the Koolau Company certain watershed land. At the same time, Bishop Trust transferred its land in Waihee, subject to the above-mentioned grant of water rights, to the Kahaluu Company.

(4) Except for a few exclusions,[6] the properties occupied by

---

[6] The BWS does not contest the continued attachment of water rights to these parcels owned by plaintiff Hall.

the plaintiff taro farmers were purchased from the Kahaluu Company or Bishop Trust subject to water rights reservations. The property occupied by plaintiff Nakata was purchased with a restriction which specifically identified the quantity of water he was entitled to withdraw,[7] and the properties currently occupied by the other farmers, except for those limited areas that were not subject to any restriction, were purchased subject to the above-mentioned grant of water rights in favor of the Koolau Company.

(5) In 1955, in the settlement of a condemnation action, BWS' predecessor in interest purchased the watershed property and water rights held by the Koolau Company for $900,000.

Thus, a critical issue in this case is whether most of the water rights theretofore attaching to the plaintiff taro farmers' lands were effectively severed and transferred by deed to the BWS. The trial court, interpreting our opinion in *McBryde v. Robinson, supra,* as precluding the severance of such rights, held that the water rights of the plaintiffs could not be severed from the land to which they appertained and the deed by which the Koolau Company conveyed certain lands and all water rights that it owned in Waihee to the BWS was therefore a nullity with respect to any attempted conveyance of water rights. This conclusion is of course contested by the BWS.

### B.

Having established that the water rights of the plaintiffs were not

---

[7] In 1941, land including the parcel of land in Waihee now farmed by plaintiff Nakata was conveyed by Bishop Trust to Thomas Higa, the predecessor-in-interest of the present owner, T & S, Inc. The 1941 deed contained a restriction limiting the water rights associated with the parcel as follows:

And also TOGETHER WITH the following water rights:

the right to take from the streams and ditches from the Grantor sufficient water to irrigate taro and other crops actually growing at any time on such land, but not to exceed 30,000 gallons per acre per day for not more than 4.85 acre per day for not more than 4.85 acres that is to say, a total of 145,000 gallons per day of 24 hours; the right to take from streams and ditches of the Grantor water sufficient for domestic purposes on the granted premises and for the watering of any livestock that may be on the granted premises; the right to take from the streams and ditches of the Grantor not more than 5,000 gallons per day for irrigation of crops on any portion of the granted premises other than the 4.85 acres of wet land, it being understood and agreed that the foregoing granted water rights constitute all the water rights to which the granted premises are or shall be entitled under or by reason of this deed; . . . .

severed and transferred to the BWS by the 1955 deed, it remained for the trial court to identify and quantify the respective entitlements to water. As to appurtenant rights, the plaintiffs identified to the court's satisfaction those areas of land which were utilized to cultivate taro at the time of the property's conversion into fee simple and to which appurtenant water rights therefore attached. Neither side contests these findings. However, the court found that insufficient evidence had been presented regarding the measure of such rights because such a determination would require proof of taro's water requirements in the Waihee Valley at the time of the Mahele. Plaintiffs contend in their appeal that the evidence which they presented in current taro farming methods and water requirements was sufficient to establish the quantity of water appertaining to their lands.

With respect to riparian rights, the trial court found all the plaintiffs' lands to be riparian except for three excluded areas.[8] As to the actual quantity of water to which the riparian lands were entitled, the court concluded that "based on conflicting evidence" the plaintiffs were entitled to 2.7 mgd for the cultivation of taro. Both sides now contest this determination, the plaintiffs asserting that their riparian rights entitle them to the undiminished flow of the stream or at least the 4 mgd that they assert is necessary to irrigate their taro crops and retard the spread of pythium, and the BWS asserting that such an allocation exceeds the quantity to which the plaintiffs are entitled.

### C.

The remedy afforded the plaintiffs was a permanent injunction prohibiting the BWS from causing the diversion of waters from the source of the Waihee stream that would have the effect of reducing the flow of the stream to below 2.7 mgd. The court concluded the remedy was proper as a product of its "balancing the equities", since any further diminution of the stream's flow would cause irreparable injury to the plaintiffs' livelihood and a minimum flow of 2.7 mgd

---

[8] Plaintiffs contest the exclusion of these areas from land possessing riparian rights, while the BWS contends that the trial court incorrectly attached riparian rights to the Wongs' holdings in the adjoining ahupuaa of Kahaluʻu. We find no basis for error in the court's conclusions in either respect.

would allow the BWS to adequately supply the demands of its consumers without causing damage to the BWS's other water sources. Plaintiffs contest the adequacy of the relief provided and the BWS challenges the propriety of such relief. The principal grounds for the BWS's argument are the existing commitment of the water resources of Waihee to public use and the fact that its withdrawal of water is from a groundwater source rather than from the stream itself.

## III. ISSUES

In our estimation the dispositive questions in this appeal are:

(A) Whether most of the plaintiff taro farmers' appurtenant and riparian rights were severed and conveyed to the BWS;

(B) Whether the trial court erred in finding that the plaintiff taro farmers were entitled to 2.7 mgd by virtue of their riparian rights, and that the quantity of water to which they were entitled by virtue of their appurtenant rights was not demonstrated by evidence;

(C) Whether the BWS's diversions diminishing the stream cannot be enjoined because they are from a groundwater source rather than from the stream itself;

(D) Whether the issuance of an injunction was improper because of the commitment of the resource to "public use."

## IV. DISCUSSION

### A. SEVERANCE OF RIPARIAN AND APPURTENANT RIGHTS

The plaintiff taro farmers' claims to the waters of the Waihee stream are premised on *McBryde v. Robinson, supra.* There, we held, inter alia, that 1) HRS § 7-1, originally enacted in 1850 as section 7 of our kuleana act, imposed the "natural flow" doctrine of riparianism upon the waters of our state; 2) that riparian water rights appertain only to land adjoining a natural watercourse for its use; and 3) that the right to the use of water by virtue of its application to the land at the time of the Mahele, *i.e.,* appurtenant water rights, may be used only in connection with those particular parcels of land to which that right appertains. Plaintiffs read *McBryde* as stating that neither

appurtenant nor riparian rights can be severed from the land. Thus they contend the deed by which the BWS claims to have purchased their rights was a nullity and all water rights in the ahupuaa of Waihee are still intact.

The BWS contends *McBryde* is not subject to being so interpreted and applied. It not only argues against any reading that would forbid the severance of water rights, but urges this court to overrule *McBryde* and reinstitute what it regards as prior Hawaii water law on surplus and appurtenant water rights.[9]

### i. APPLICABILITY OF *McBRYDE v. ROBINSON*.

We decline the invitation to overrule *McBryde v. Robinson, supra.* We find that the rules of law posited in that opinion are applicable here.

*McBryde* has been criticized as an unjustifiable deviation from pre-existing water law.[10] But a re-examination of the development of the laws governing water in this jurisdiction convinces us of its soundness. Our local system of water rights is "based upon and is an outgrowth of ancient Hawaiian customs and methods of Hawaiians in dealing with the subject of water." *Territory v. Gay,* 31 Haw. 376, 395 (1930). In ancient times there was no resource more precious. Although there is a belief that at some point this resource was transformed into a freely transferable private commodity, we do not find this to be so. For in *McBryde* we re-examined what some believed to be the foundation of certain private rights and interests in water and found them to be fatally flawed. We therefore set about to correct these errors of the past, as it was both our duty and prerogative to do.

---

[9] The BWS also argues that any application of *McBryde* to this case holding the transfer of water rights void would constitute a "taking" in violation of the Fifth Amendment of the United States Constitution. Under the circumstances of this case we do not agree that a fifth amendment issue is raised.

The Fifth Amendment of the Constitution provides that "No . . . private property [shall] be taken for public use, without just compensation." At issue in this case are the rights to use of private parties who claim an interest in property rights claimed to be held by an agency of government. The ostensible usurpation of private rights by the public is not at issue.

[10] See, *Robinson v. Ariyoshi,* 441 F. Supp. 559 (D. Hawaii 1977).

Our understanding of the necessity for the holdings in *McBryde* begins with the native system of water allocation. This system has been recently described as follows:

> Perhaps the essential feature of the ancient water system was that water was guaranteed to those natives who needed it, provided they helped in the construction of the irrigation system. Because agriculture was a matter of great importance to the Hawaiians, they were, in general, willing to contribute their efforts to the water system. The konohikis aimed to secure equal rights to all makaainana and to avoid disputes. Beneficial use of water by the makaainana were also essential to the continued delivery of water. The natives were subject to compulsory maintenance work on the auwais under the supervision of the konohiki. The konohiki, on the other hand, was reluctant to impose unreasonable burdens on the tenants because they were normally free to leave a particular plot if unhappy with the konohiki. Hence a "spirit of mutual dependence and helpfulness prevailed, alike among the high and low, with respect to the use of water." (Citations omitted).

Van Dyke, Chang, Aipa, Higham, Marsden, Sur, Tagamori and Yukimoto, *Water Rights in Hawaii,* in Land and Water Resource Management in Hawaii 141 (1977). The foregoing characterization is uncontroverted.

The system based on this "spirit of mutual dependence" was a stable one. While the authority for the distribution of water ultimately rested in the King, the chiefs, or their agents (konohiki), "the aim of the konohiki and all others in authority was to secure equal rights to all and to avoid quarrels." Perry, *A Brief History of Hawaiian Water Rights* 7 (1912). This benevolent attitude was not a product of indifference to the application of water nor of overabundance. On the contrary, the cooperative nature of the system appears to have stemmed from the critical import of water in the lives of the people.

For example, the Hawaiian word "kanawai" denoting law or laws related originally to regulations regarding water. *Id.* at 3. Interference with existing auwais was punishable by death, and the body of the offender was used to repair whatever damage done to deter further offenses. Nakuina, *Ancient Hawaiian Water Rights,* in Thrums Hawaiian Annual 79 (1894). Failure to keep one's auwai in repair was a ground for the cutting off of water privileges. *Id.* at 82. And the

completion of a new watercourse was the occasion for religious thanksgiving and celebration. *Id.*

As with the ownership of land, there were no fixed rights to water. Hutchins, *The Hawaiian System of Water Rights,* 21, 22 (1946). Rather, water privileges were earned through participation in the construction of the irrigation systems and retained only by the productive application of the waters to which one was thereby entitled. Handy & Handy, *Native Planters in Old Hawaii* 31 (1972). Inasmuch as the prosperity of the landlord was dependent upon the productivity of all of his assigned lands, he necessarily attempted to insure that maximum benefit was achieved through the application of the vital resource. *Id.* at 279. In times of plenty, all shared in nature's munificence; in times of scarcity, allocation was resorted to in order to insure the survival of all.

The nature of the activity to which water was applied reinforced the cooperative aspects of its allocation. *Id.* See also, Earl, *Control Hierarchies in the Traditional Irrigation Economy of the Halelea District, Kauai, Hawaii,* 160 (1973). The principal crop requiring irrigation was taro, the staple of the native Hawaiian lifestyle. The irrigation of taro called for flowing water, most of which was not consumed by the land. Hence, a cooperative system whereby unused waters were returned to their source or allowed to flow into lower adjoining patches maximized the application of the resource. Handy & Handy, *Native Planters in Old Hawaii, supra.*

The limitations of technology also fostered cooperation, for the irrigational systems required in the culture of taro could only be constructed through the joint efforts of those who would benefit thereby. That the labor of the commoners would be rewarded by the just application of the resource to their land was insured by the fact that they were not "serfs" tied to the land by any particular obligation to the landlord, but were free to leave at any time and begin their efforts anew in virtually any uncultivated area. Van Dyke et al., *Water Rights in Hawaii, supra.*

Finally, it was entirely to the advantage of the konohiki or landlord that water be allocated according to industry and need. Prior to the imposition of western ways water had little value apart from its application. Thus, it was considered strictly a resource to be used when required, not a commodity. In an agrarian society where technological capacity for storage or long range transport was non-

existent, there was simply no value in hoarding water or in even fixing an amount to which any person would be entitled. This was, of course, to change.

In 1840 the first constitution of the Kingdom of Hawaii proclaimed that although all property belonged to the crown "it was not his private property. It belonged to the Chiefs and the people in common, of whom [the King] was the head and had the management of landed property." Hawaii Const. of 1840 in *Fundamental Laws of Hawaii* 3 (1904). Thus, prior to the Mahele, all land remained in the public domain. However, other laws passed during the same period laid the foundation for the eventual imposition of private property rights in land by limiting the King's and landlords' heretofore unregulated authority to disseize one to whom land had been granted and insuring certain rights of the common people and lesser lords. In contrast, the law governing the regulation of water, passed in 1839, instead of affirming private authority, treated the resource as a benefit reserved to the community.

Specifically, the law "Respecting Water for Irrigation" provided that:

> In all places which are watered by irrigation, those farms which have not formerly received a division of water, shall when this new regulation respecting lands is circulated, be supplied in accordance with this law, the design of which is to correct in full all those abuses which men have introduced. *All those farms which were formerly denied a division of the water, shall receive their equal proportion. Those bounties which God has provided for the several places should be equally distributed, in order that there may be an equal distribution of happiness among all those who labor in those places.* The allowance of water shall be in proportion to the amount of taxes paid by the several lands. For *it is not the design of this law to withhold unjustly from one, in order to unjustly enrich another according to the old system which has been in vogue down to the present time. That the land agents and the lazy class of persons who live about us should be enriched to the impoverishment of the lower classes who with patience toil under their burdens and in the heat of the sun is not in accordance with the designs of the law.* . . . Such is considered to be the proper course by this law, regulating the property of the kingdom; not in accordance with the former customs of the country which was for the chiefs and land agents to monopolize to themselves every source of profit.

Not so with this law. (Emphasis added.)
Laws of 1842 in *Fundamental Laws of Hawaii* 29 (1904).

The law, passed a mere six years prior to the Mahele, is significant both in terms of its provisions and obvious underlying sentiment. The distribution of water is predicated not upon servience to the landlord of an ahupuaa but rather on taxes paid to the crown, thereby suggesting that the control of all waters lay with the central government rather than the landlords. Also noteworthy is the continued treatment of water as a natural bounty to be distributed according to industry and need rather than by virtue of control of the surrounding lands.

The law may have been a result of the destruction of natural restraints on the konohiki's historical authority over water.[11] As long as the konohiki was reliant upon the labor of the tenants both to work his own land and to insure the improvement of his ahupuaa, he was bound to a system of equitable distribution of water to insure mutual benefit. The advent of the western mercantile society diminished reliance upon the working of the land as a basis of wealth. Thus, with the introduction of the western concept of material wealth, water itself tended to be considered a commodity. In the absence of the natural limitation on abuses of authority, a need for the imposition of an equitable order becomes apparent if the King desired that this natural bounty be shared equally among his people.

The next major step in the evolution of private property rights was the formation in 1845 of the Board of Land Commissioners to quiet land titles. See *Law Creating the Board of Commissioners to Quiet Land Titles,* in Fundamental Laws of Hawaii 137 (1904). It was the Land Commission's responsibility to ascertain or reject claims of interests in land brought before it. Decisions of the Board were to be made in accordance *with the civil law and native customs of the Kingdom.* The Board itself was not empowered to grant fee simple title to land. Rather, its duty was to define each applicant's identifiable interests in land and issue an award describing those interests. Actual title to land could be gained only by a payment of commutation to the Kingdom and issuance of a royal patent. See, Chinen, *The Great*

---

[11] For a general discussion of the deterioration of the native order at this time, *see* Kuykendall, *The Hawaiian Kingdom 1778-1854* (1938); Levy, Native Hawaiian Land Rights, 63 Cal. L. Rev. 848 (1975).

*Mahele: Hawaii's Land Division of 1848* (1958).

To carry out its duties, the Land Commission adopted principles that were to be followed in quieting title to land. The principles were subsequently also adopted by the legislative council of the Kingdom and were made binding rules by which all claims to land would be tested. Laws of 1847 at 81, RLH 1925, Vol. II at 2124. In its statement of principles the Land Commission related the necessity of its establishment to the unenforceability of the laws passed at the time of the Constitution of 1840, noting that:

Neither the laws of 1839 nor of 1840 were found adequate to protect the inferior lords and tenants, for although the violators of law, of every rank, were liable to its penalty, yet it was so contrary to ancient usage, to execute the law on the powerful for the protection of the weak, that the latter often suffered, and it was found necessary to adopt a new system for ascertaining rights, and new measures for protecting those rights when ascertained, and to accomplish this object the Land Commission was formed.

The Land Commission therefore viewed its responsibilities as including the actualization of the laws of 1839 and 1840, among them, of course, the law governing water for irrigation which persisted in treating water as a commonly held resource.

Thus, when in the next paragraph the Board reserves from allocation to private persons "the sovereign prerogatives" of the King, including the power:

To encourage and even to enforce the usufruct of lands for the common good[,]

it is clear that in accordance with pre-existing civil law and native usage, the Commission intended to reserve to the sovereign the right to regulate and allocate water resources in accord with the needs of the people of the Kingdom. We therefore concur with the conclusion reached in *McBryde* that:

[T]he Mahele and subsequent Land Commission Award and issuance of Royal Patent right to water was not intended to be, could not be, and was not transferred to the awardee, and the ownership of water in natural watercourses, streams and rivers remained in the people of Hawaii for their common good.

54 Haw. at 186-87, 504 P.2d at 1339.

An expression of the will of the sovereign with respect to waters is

next found in section 7 of the Enactment of Further Principles. Laws of 1850, p. 202. This section provided in relevant part that:

> The people also shall have the right to drinking water, and running water and the right of way. The springs of water and running water, and roads shall be free to all, should they need them, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water courses which individuals have made for their own use.

In *McBryde* meaning was given to this language for the first time when we ruled that the statute, at the time of its passage, imposed the "natural flow" doctrine of riparianism upon the waters of the Kingdom. We continue to find this interpretation to be appropriate and proper.

First, the doctrine is consistent with the needs of native commoners at the time of the law's passage. Taro, the predominant agricultural crop, grew best where a steady flow of running water, most of which could be subsequently utilized by lower riparian users, occurred; the cultivation of taro took place principally upon riparian lands; and grants to commoners were restricted to lands they had in fact cultivated. Second, the principles underlying the doctrine are consistent with those that appear to pervade the native system of water allocation and pre-existing civil law inasmuch as: "title" to the water was not equated with the right to use; each person's right to use was a "correlative" nature; and rights to use were predicated upon beneficial application of the water to the land. And third, the presence of the riparian doctrine in this jurisdiction had, prior to 1930, been repeatedly adverted to in our caselaw. *See, e.g., Peck v. Bailey*, 8 Haw. 658, 661 (1867) (dicta describing riparian landowners' rights to water); *Davis v. Afong*, 5 Haw. 216 (1884) (spring and underground streams treated according to riparian principles); *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co.*, 15 Haw. 675 (1904) (surplus water defined as water not covered by prescription or riparian rights).

In *McBryde*, we did not lightly infer that a judicially determined system of water rights was subject to alteration. Quite to the contrary, our decision there was premised on the firm conviction that prior courts had largely ignored the mandates of the rulers of the Kingdom and the traditions of the native Hawaiians in their zeal to convert these islands into a manageable western society.

*Horner v. Kumuliilii*, 10 Haw. 174 (1895), illustrates some of the difficulties experienced in translating a system of water rights predicated upon mutual benefit into one based on private rights. The case involved the claim of the Pioneer Mill to the waters of the Kauaula Stream, which runs through the valley of the same name on the island of Maui. The valley divided into numerous ilis, ahupuaas and kuleanas, each of which shared in the waters of the stream. Under the ancient system of distribution, the valley was separated into two divisions of eleven land units each. Water was distributed to each unit by way of auwais that ran from the stream. Each unit received water once every eleven days, with a unit from one division taking by day and another by night.

The plaintiff-plantation became the owner and occupant of much of the land of the valley; after having violated the ancient system for more than twenty years, it claimed a prescriptive right to all the water it needed and also sought the strict imposition of the ancient system of rotation on the remaining "natives".

Exercising equitable powers, the court reinstituted the ancient system of rotation. In dicta, however, it expressed misgivings about the imposition of a fixed system of personal water rights and the inefficiency of such a transmutation of the ancient system. It noted that the eleven-day system was a product of an agreement of the konohikis of the various ahupuaas and ilis and that under the ancient system:

> The konohiki endeavored to secure equality of division and to avoid troublesome quarrels between the tenants; and when the quantum of water in the stream diminished through drought he saw to it that the quantity used by each was divided equally. (W)hen one kuleana seemed to need more water than the others at any particular time the konohiki on request would allow a constant small stream of water to continue in the particular auwai, after the patches were filled and while the main body of land was receiving its assigned supply. . . . *If the plaintiffs are "konohikis" of the various ahupuaas and ilis owned by them and are successors of the rights of the konohikis and insist upon them they ought to bear the burdens and responsibilities of the konohikis. But supplies of water by permission do not create a right to them and the court cannot compel favors to be granted.* (Emphasis added.)

*Id.* at 178-79.

The western doctrine of "property" has traditionally implied certain rights. Among these are the right to the use of the property, the right to exclude others and the right to transfer the property with the consent of the "owner". In conformance with creation of private interests in land, each of these rights were embodied in the delineation of post-Mahele judicial water rights. Ostensibly, this judge-made system of rights was an outgrowth of Hawaiian custom in dealing with water. However, the creation of private and exclusive interests in water, within a context of western concepts regarding property, compelled the drawing of fixed lines of authority and interests which were not consonant with Hawaiian custom.

Thus, the distinction drawn between "rights" and "supplies by permission" or "favors" in *Horner*, while making perfect sense within the western understanding of "property", would make no sense at all under the ancient system of allocation. Under the ancient system both the self-interest and responsibility of the konohikis would have created a duty to share and to maximize benefits for the residents of the ahupuaa. In other words, under the ancient system the "right" of the konohiki to control water was inseparable from his "duty" to assist each of the deserving tenants. The private division of land and the subsequent division of water allowed for the separation of this "right" from the concomitant "duty".

The pattern of isolating a traditional "right" from its correlative duties and obligations continued to serve as a basis for the evolution of private interests in water. Thus, in 1896 the court condoned the sale and transfer of appurtenant water on the grounds that inter-ahupuaa transfers were made in ancient times,[12] ignoring the fact that such transfers were undoubtedly made to satisfy some particular communal purpose and not for the exclusive benefit of a particular transferor or transferee. Similarly, in 1904, surplus water was deemed the property of the konohiki of the ahupuaa of its origin since "no limitation . . . existed or was supposed to exist to his power to use the surplus water as he saw fit."[13] Again, the essential nature of the konohiki's customary powers over the waters of his ahupuaa was disregarded, and an individual was granted a personal "right" to

---

[12] *Wong Leong v. Irwin*, 10 Haw. 265 (1896).

[13] *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co.*, 15 Haw. 675, 680 (1904).

profit, presumably by virtue of ancient authority, from the sale and application of water without regard for the consequences to those who historically would have been within his charge.[14]

We cannot continue to ignore what we firmly believe were fundamental mistakes regarding one of the most precious of our resources. *McBryde* was a necessary and proper step in the rectification of basic misconceptions concerning water "rights" in Hawaii.

---

[14] *Cf.* Handy & Handy, Native Planters, *supra* at 63-64:

#### WATER RIGHTS

Inalienable title to water rights in relation to land use is a conception that had no place in old Hawaiian thinking. The idea of private ownership of land was likewise unknown until Kamehameha's autocracy, established as a result of the intrusion of foreign concepts, set up the figment of monarchy, a politico-social pattern alien to the Polynesian scene theretofore existing.

Water, whether for irrigation, for drinking, or other domestic purposes, was something that "belonged" to Kane-i-ka-wai-ola (Procreator-in-the-water-of-life), and came through the meteorological agency of Lono-makua the Rain-provider. The *mo'i (ali'i nui,* great chief), the ranking aristocrat who was paramount by reason of genealogical primacy, was a living scion of Lono and of Kane, and as such was instrumental in the magico-religious induction of rain and flowing water which gave life to taro and *'uala* and paramount chief, born on the soil and hence first-born of the *maka'ainana* of a *moku* (island or district), was a medium in whom was vested divine power and authority. But this investment, which was established ritualistically as well as by genealogical primacy, was instrumental in providing only a channeling of power and authority, not a vested right. The person of the *ali'i nui* was sacred *(kapu)* as though he were a god *(akua).* His power and authority *(mana)* was complete. But this was not equivalent to our European concept of "divine right." The *ali'i nui,* in old Hawaiian thinking and practice, did not exercise personal dominion, but channeled dominion. In other words, he was a trustee. The instances in which an *ali'i nui* was rejected and even killed because of his abuse of his role are sufficient proof that it was not personal authority but trusteeship that established right *(pono).*

Water, then, like sunlight, as a source of life to land and man, was the possession of no man, even the *ali'i nui* or *mo'i.* The right to use it depended entirely upon the use of it. So long as a family lived upon and cultivated land, using a given water source, and continued to contribute its share of labor required to maintain that water source, just so long did it maintain its "right" to that water. If the family did not use it, it no longer had a right to claim it.

The freezing of land titles and related irrigation and fishing rights by legalistic procedures and grants in fee simple was wholly a foreign innovation. After this occurred, from the point of view of old Hawaiian principles of land, water, and fishing tenure, the only Hawaiians who maintained land, water, or fishing rights were those who stayed with and continued to use their areas of cultivation, water, and fishing grounds. Those who abandoned and neglected them, leased or sold them, no longer had any rights, namely the continued use and exercise of the right to use.

## ii. SEVERABILITY OF RIPARIAN RIGHTS.

Having acknowledged and ratified *McBryde's* vitality, we turn to the question of whether the riparian rights of the plaintiffs were effectively severed and transferred by the language of the various deeds of title purporting to do so. We conclude they were not.

BWS argues, and we agree, that even the "natural flow" theory of riparianism does not, in most jurisdictions, prohibit the annulment or severance of riparian rights by contract. *See,* 1 Clark, *Waters and Water Rights,* 70 (1967). But riparian rights in Hawaii are of statutory rather than common law origin. The privileges and rights attaching to riparian land should therefore be determined consistently with the statute to which their genesis is traceable.

Riparian rights in Hawaii are a product of the people's statutory rights to "flowing" and "running" water currently embodied in HRS § 7-1 (1976). HRS § 7-1 was originally enacted in 1850 as section 7 of what has come to be known as the Kuleana Act. The first six sections of the Act enabled the common people of Hawaii to secure fee simple title to the lands they actually cultivated. The seventh section contained the rights that were to accompany a commoner's tenancy. The section was drafted at the behest of the King and was reported to reflect his concern that "[a] little bit of land even with allodial title, if they be cut off from all other privileges would be of very little value." Privy Council Minutes, July 13, 1850. Thus, it appears that the riparian water rights of HRS § 7-1 were established to enable tenants of ahupuaas to make productive use of their lands.

Riparian rights in Hawaii are thus analogous to the federally reserved water rights accruing to Indian reservations pursuant to *Winters v. United States,* 207 U.S. 564 (1908). In words reminiscent of Hawaii's King, the Supreme Court has described that decision as follows: "The Court in *Winters* concluded that the Government, when it created [an] Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless." *Arizona v. California,* 373 U.S. 546, 600 (1963). The Court in *Winters* thus implied from a treaty establishing the Fort Belknap Indian Reservation a reservation of enough unappropriated waters to fulfull the purposes of the treaty.

The issue of the transferability of Indian water rights vested pursuant to the *Winters* doctrine has also arisen. *See generally* Palma,

*Considerations and Conclusions Concerning the Transferability of Indian Water Rights,* 20 Nat. Res. J. 91 (1980). We find a particular federal court's treatment of this analogous situation instructive. In *Colville Confederated Tribes v. Walton,* 460 F. Supp. 1320 (E.D. Wash. 1978), the question before the court was whether the water rights reserved to Indian reservations were effectively transferred to subsequent non-Indian purchasers of reservation lands. The court, looking to the underlying rationale for the implied reservation of water, concluded that they were not. *Id.* at 1328. It reasoned that since, under the *Winters* doctrine, water was impliedly reserved to ensure that the land set aside for a permanent homeland would have water necessary for the purposes of the reservation, the water right was implicitly limited to purposes of the reservation and were therefore extinguished when the lands passed from Indian hands. *Cf. Cappaert v. United States,* 426 U.S. 128, 141 (1976) (implied federal reservations of water limited to "only that amount necessary to fulfill the purposes of the reservation, no more"). *But see United States v. Adair,* 478 F. Supp. 336 (D. Ore. 1979) (permitting transfer of *Winters* doctrine rights because it would advance the purpose of permitting Indians to sell their lands on equal terms with non-Indians).

We find such reasoning highly persuasive and applicable to the situation before us. And we likewise conclude that the nature of the water rights provided in HRS § 7-1 are limited by the purposes for their establishment. We are equally convinced that the creation of an independent source of profit for the possessors of water rights was not included among such purposes. The language of the statute itself, referring specifically to other articulated rights, provides that privileges enumerated in that section were "for their [the people's] own use, but they shall not have the right to take such articles to sell for profit." HRS § 7-1. We conclude that the riparian water rights created by HRS § 7-1 were not intended to be, and cannot be, severed from the land in any fashion. Their sole purpose is to provide water to make tenants' lands productive — no other incident of ownership attached. The trial judge in this case thus correctly ruled that all attempts to sever or extinguish the riparian rights of the plaintiffs were ineffective.

Additional support for this conclusion is found in *Damon v. Tsutsui,* 31 Haw. 678 (1930), which involved an attempt by a landlord to sever by deed certain fishing rights that had been statutorily

reserved to tenants. The court held the attempted severance was without effect as to the original tenant's successor in interest. It reasoned that the severance was ineffective because the fishing rights simply were not the landlord's to convey because the tenant "receives his rights *through the statute*," (emphasis added) *id.* at 689, rather than from his predecessor in interest.

Here, as in *Damon*, the riparian rights purportedly reserved in the plaintiff's respective deeds were statutory creations. They were therefore not subject to reservation by deed; they were not the grantor's to reserve.

### iii. SEVERABILITY OF APPURTENANT RIGHTS.

Unlike riparian rights, appurtenant water rights are incidents of land ownership. In the first of our recorded cases governing water rights the nature and foundation of these rights were described thusly:

> [When a grantor] has conveyed portions [of an] ahupuaa to several persons . . . [e]ach grantee will hold all that has been conveyed to him, unless it should conflict with a previous conveyance. This includes the [artificial] water on their lands and all the water which the lands had enjoyed from time immemorial.

*Peck v. Bailey, supra* at 662. These rights were characterized by the court as "appurtenant to . . . lands", *id.*, and superior to riparian rights inasmuch as they constituted "an easement in favor of the [property with an appurtenant right] as the dominant estate." *Id.*

Thus, appurtenant water rights are rights to the use of water utilized by parcels of land at the time of their original conversion into fee simple land. In *McBryde v. Robinson, supra*, we ruled that the appurtenant nature of these rights precluded the transfer of such waters. We said "[t]he use of the water acquired as appurtenant rights may only be used in connection with that particular parcel of land to which the right is appurtenant", overruling "any contrary indications in our caselaw." 54 Haw. at 191, 504 P.2d at 1341. The trial court in this case read the foregoing limitation to preclude the severance of such rights so that the deeds purporting to transfer or reserve plaintiffs' water rights were of no effect with respect to any appurtenant rights which attached to their lands.

We agree that the rule posited in *McBryde* prevents the effective

severance or transfer of appurtenant water rights. This position is consistent with the general rule that appurtenant easements attach to the land to be benefited and cannot exist or be utilized apart from the dominant estate. ALI, Restat. Prop. § 487, comment b. We find, however, that while no appurtenant rights were effectively transferred in this case, the deed that attempted to reserve such rights had the effect of extinguishing them. For while easements appurtenant may not be utilized for other than the dominant estate, "[t]here is nothing to prevent a transferor from effectively providing that the benefit of an easement appurtenant shall not pass to the transferee of the dominant [estate]." *Id.*

There appears to be no question here that the plaintiffs' grantors, in attempting to reserve the water rights to themselves in spite of the transfer of the lands, intended to extinguish those rights which would otherwise have attached to plaintiffs' lands. While the nature of the water rights involved necessarily precluded the former, nothing would preclude the giving of effect to the latter. Thus, while the trial court correctly ruled that the BWS could not have acquired the appurtenant water rights of the plaintiffs because of *McBryde*, it erred in holding that the plaintiffs' land retained such rights, inasmuch as they were effectively extinguished by the attempted reservation of such rights.

## B. THE MEASURE OF RIPARIAN AND APPURTENANT RIGHTS

### i. MEASURE OF RIPARIAN RIGHTS.

In *McBryde* we described riparian rights as "the right [of a riparian owner] to use water flowing [in a natural watercourse] without prejudicing the riparian rights of others and the right to the natural flow of the stream without substantial diminution in the shape and size given it by nature. This right is incapable of measurement into number of gallons per day." 54 Haw. at 198, 504 P.2d at 1344. The description mirrors that found in our first water case, *Peck v. Bailey, supra:*

> A riparian proprietor has the right to enjoy the benefits of a flow of water, as an incident to his estate, can use the water for irrigation, watering his cattle, and other domestic purposes, provided he does not materially diminish the supply of water or

render useless its application by others.

8 Haw. at 662. It would thus appear that riparian owners are entitled to the use of natural flow of the stream under the so-called "natural flow" theory of riparianism.

The BWS points out, however, that the doctrine's requirement of an undiminished streamflow fails to maximize the social and economic utility of the resource and "natural flow" has thus been largely abandoned in the United States in favor of the so-called "reasonable use" doctrine of riparianism. See, 5 Powell, *The Law of Real Property*, ¶ 711 (1949). Under this doctrine a riparian owner is entitled only to a "reasonable use" of the waters of a natural watercourse and may not bring an action to prohibit the reasonable use of another absent a demonstration of injury to his own use. *Id.*

We agree that the effect of permitting riparian owners to enjoin diversions beneficial to others in the absence of a demonstration of actual harm may occasionally lead to wasteful or even absurd results. But as we said, we are convinced the exclusive purpose of the statutory imposition of riparian rights in this jurisdiction was to enable tenants of ahupuaas to make productive use of their lands and that our interpretation of these rights must proceed in conformity with this purpose. And while the statute creating riparian rights may indeed have been intended to engraft the "natural flow" version of riparianism onto the waters of our land as found in *McBryde,* the continued satisfaction of the framers' intent requires that the doctrine be permitted to evolve in accordance with changing needs and circumstances. We therefore hold that in order to maintain an action for a diversion which diminishes the quantity or flow of a natural watercourse, a riparian owner must demonstrate actual harm to his own reasonable use of those waters.

We are satisfied that plaintiffs' use of the waters of the Waihee stream is reasonable. Their mode of irrigation approximates that which has historically been utilized for the cultivation of taro. While this method may not necessarily be the most efficient means of irrigation, we do not find it unreasonable as a matter of law, for there has been no demonstration of unnecessary waste or proof that any more efficient means of irrigation are available to them. We are also satisfied that the trial court correctly ruled that the BWS's diminution of the flow of Waihee stream damaged plaintiffs' taro production. Plaintiffs are therefore entitled, pursuant to their riparian

rights, to apply to their riparian lands waters from the Waihee stream sufficient to cultivate their crops in the manner in which they were accustomed prior to the BWS diversions that led to a damaging of their crops.

Having established the existence of their riparian rights and the reasonableness of their use, we are reluctant to impose a further burden on plaintiffs to prove the precise quantity of water to which they are entitled. Rather, the continuing use of the waters of the stream by the wrongful diversion should be contingent upon a demonstration that such use will not harm the established rights of others.[15]

### ii. MEASURE OF APPURTENANT RIGHTS.

With respect to plaintiffs' lands where the appurtenant water rights were not extinguished, we find the trial court erred in concluding that plaintiffs failed to demonstrate adequately the quantity of water to which they were entitled. For while the proper measure of those rights is indeed the quantum of water utilized at the time of the Mahele, requiring too great a degree of precision in proof would make it all but impossible to even establish such rights. We therefore hold that when, as in this case, the same parcel of land is being utilized to cultivate traditional products by means approximating those utilized at the time of the Mahele, there is sufficient evidence to give rise to a presumption that the amount of water diverted for such cultivation sufficiently approximates the quantity of the appurtenant water rights to which that land is entitled. Plaintiffs' remaining lands with appurtenant rights are therefore entitled to that amount of water utilized to cultivate taro prior to the BWS diversions that led to the damaging of their crops.

### C. ENJOINING OF GROUNDWATER DIVERSIONS WHICH INTERFERE WITH SURFACE WATER RIGHTS

The BWS contends that it has a right to continue to divert and transfer water from the Waihee dike system irrespective of the rights

---

[15] The trial court gives no explicit indication of how its conclusion as to the quantity of plaintiffs' riparian rights was reached other than it being based on "conflicting evidence." We therefore feel it is necessary for this figure to be re-examined in light of the above-stated rule.

of plaintiffs in the flow of Waihee stream because its diversions are from the groundwater source rather than from the stream itself. Conversely, plaintiffs contend that given the limitations on transferability found in *McBryde*, the BWS has no right to transfer water away from the property where it arises.

In most jurisdictions the rights to ground and surface water have evolved separately. The common law in treating surface and groundwater as distinct failed to recognize that both categories represent no more than a single integrated source of water with each element dependent upon the other for its existence. *See* Haase, *Interrelationship of Ground and Surface Water: An Enigma to Western Water Law,* 10 S.W. U. L. Rev. 2069 (1978). Hawaii is no exception; artesian waters have been held subject to the doctrine of correlative rights, *City Mill Co. v. Honolulu Sewer and Water Comm.,* 30 Haw. 912 (1929), stream waters have been held subject to riparian and appurtenant rights, *McBryde v. Robinson, supra,* and no attempt has been made to reconcile the possible conflicts between the two systems.

The trend in many states has been to recognize the interrelationship between surface and groundwater sources and to combine the control and management of both under a unified statutory scheme. See, 5 Clark (ed), *Waters and Water Rights, supra,* § 441 at 415, and statutes cited therein. This acknowledgment of the unity of the hydrological cycle has been characterized as the "modern scientific approach". Trelease, *Alaska's New Water Use Act,* 2 Land and Water L. Rev. 1, 15 (1967). We agree that the law must recognize that "all waters are part of a natural watercourse, whether visible or not, constituting a part of the whole body of moving water". *City of Colorado Springs v. Bender,* 148 Colo. 458, 461, 366 P.2d 552 (1961). We therefore hold that where surface water and groundwater can be demonstrated to be physically interrelated as parts of a single system, established surface water rights may be protected against diversions that injure those rights, whether the diversion involves surface water or groundwater. *See* Restat. Torts 2d 858. BWS's groundwater diversions are therefore properly subject to limitation insofar as such diversions directly interfere with plaintiffs' riparian rights.[16]

---

[16] The BWS contends that the impact of such a rule would be to make groundwater rights unpredictable. It further argues such a rule would be contrary to the public interest in that underground sources are more productive than surface water

Having determined that BWS groundwater diversions were properly treated by the trial court as contingent upon noninterference with the established surface water rights of the plaintiffs, we do not find it necessary to address the question of the nature and extent of their rights to groundwater diversions at this time.

## D. PROPRIETY OF INJUNCTIVE RELIEF

The BWS interposes the doctrine of intervention of a public use as a bar to the award of injunctive relief in this case. In essence, BWS argues that an injunction is an inappropriate remedy for the wrongful diversion of Waihee streamwater because a substantial portion of the community has come to depend on such diversion for its water needs.[17]

We recognize the public use doctrine is premised upon the general principle that the public interest is a factor to be considered in determining whether injunctive relief is appropriate in any situation. The operation of this principle was described by the United States Supreme Court in *Harrisonville v. Dickey Clay Co.*, 289 U.S. 334,

---

sources and that limiting groundwater withdrawals with surface water rights may ultimately interfere with all groundwater withdrawals.

We note first that while rights to artesian waters in Hawaii have been held to be of a correlative nature, the precise extent of these rights have never been fully defined, since in the only case which addressed groundwater rights there was no necessity to do so. *City Mill Co. v. Honolulu Sewer and Water Comm., supra* at 933. Rather it was said that "[t]hose principles [delineating the scope of groundwater rights] will have to be considered and declared whenever such a question arises." *Id.* Thus groundwater rights have never been defined with exactness and the precise scope of those rights have always remained subject to development. They have thus always been in a sense "unpredictable."

As to the public interest of the rule adopted herein, we have only to consider the implications of failing to adopt such a rule. For if groundwater withdrawals were to be treated as wholly independent of surface water rights, streams which were dependent upon groundwater sources could be diminished or destroyed with impunity. We are not convinced at this point that such a rule would be in the public interest.

[17] As found by the trial court the BWS supplies the water requirements of approximately 120,000 residents on the windward side of Oahu exclusively with water from its windward pumping sources. The Waihee dike-structure supplies approximately one-third of this water and is the only windward source which can be manipulated to accommodate times of shortage or peak demand. The Waihee sources also play an integral part in the BWS's plans to satisfy future water needs and there are no immediately accessible replacement sources.

337-38 (1933), as follows:

> [A]n injunction is not a remedy which issues as of course. Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is indisputable. This is true even if the conflict is between interests which are primarily private. . . . Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling.[18]

And in considering appropriate remedies in water rights actions, a number of state courts have acknowledged the influence exerted by the public interest. *See,e.g., Adams v. Greenwich Water Company,* 138 Conn. 205, 83 A.2d 177, 183-84 (1951); *Bennett v. City of Salem,* 192 Or. 531, 235 P.2d 772, 778-79 (1951); and *Wasserburger v. Coffee,* 180 Neb. 149, 141 N.W.2d 738, 747 (Neb. 1966).

However, in sdme jurisdictions, most notably California, this general principle appears to have evolved, especially in the realm of water rights, into a less flexible public use doctrine. Its contours are unclear, and the degree to which it no longer expresses merely an aspect of the flexibility of equity is uncertain. But applied in its least flexible form, an application urged here by BWS in the context of water law, the doctrine holds that once a public use of water has intervened, a claimant who has demonstrated wrongful diversion of that water may not seek to enjoin such use, but is instead relegated to a damages remedy.

The doctrine is said to "[have] . . . its foundation chiefly in the inconvenience to the public if service is interrupted by the issuance of an injunction to restrain the use." *City of Pasadena v. City of Alhambra,* 33 Cal. 2d 908, 920, 207 P.2d 17, 25 (1949). Such inconvenience is avoided under the theory that "after property is taken for a public use by a public service corporation and has been devoted to that purpose, the public thereby and thereupon acquires rights in such public use which cannot be divested or destroyed at the behest of a private individual upon the ground or for the reason that his

---

[18] "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 552 (1937).

property will suffer damage or deteriorate in value . . . ." *Conaway v. Yolo Water & Power Co.*, 204 Cal. 125, 132, 266 P. 944, 947 (1928).

Following this theory, the doctrine attaches prime importance to *when* a public use intervenes to preclude injunctive relief for prior improper diversions. The doctrine is relatively clear in this regard: "The term 'use' as involved in the doctrine of intervention of a public use, refers to the actual *use at and before the time suit was filed,* as distinguished from a future intended use, of the property for a purpose beneficial to the public. It connotes not an intended future devotion to the public service but an actual previous devotion to the public service." (Emphasis added.) *Rank v. (Krug) United States,* 142 F. Supp. 1, 134 (S.D. Cal. 1956).[19]

Less clear in the operation of the doctrine is the question of whether a public use will intervene to preclude or create a strong presumption against injunctive relief *prior* to a claimant's actual or imputed knowledge of the wrongful diversion. Some cases appear to emphasize a claimant's prior knowledge and inaction as a prerequisite to the application of the doctrine:

> [W]here a person has suffered property belonging to him and under his control to be taken and devoted to a public use by one engaged in administering such use, and the matter has gone on so far that the beneficiaries thereof rely on its continuance and adjust their affairs accordingly, *such owner having knowledge thereof and making no objection or protest,* this conduct will be regarded by the courts as a dedication by such owner of the property to the particular public use, and he cannot thereafter interrupt nor prevent the same, his only remedy being to seek compensation for the property he has thus allowed to be taken . . . .

(Emphasis added.) *Miller & Lux v. Enterprise Canal & Land Co.,* 169

---

[19] *Rank* contains a thorough discussion of the public use doctrine and review of the California cases in the context of a major California water rights action. *Rank v. (Krug) United States, supra,* 142 F. Supp. at 130-49. Among other points made therein, the court disputes the rigid application of the doctrine urged here by BWS:

> The cases do not present the doctrine of intervention of a public use as an absolute bar to injunctive relief, but rather indicate that prohibitory injunctive relief should be granted only if it appears that no other relief is adequate. Thus it is at most indicated that a Court should be reluctant to grant a prohibitory injunction where a public use has in fact intervened prior to suit.

*Id.* at 136-37.

Cal. 415, 429, 147 P. 567, 573 (1915). See also *Conaway v. Yolo Water & Power Co., supra,* 266 P. at 948, and *Collier v. Merced Irrigation District,* 213 Cal. 554, 2 P.2d 790, 793 (1931). In contrast, other cases emphasize that the doctrine may apply in the absence of claimant's knowledge of the wrongful diversion:

> The doctrine that intervention of a public use will foreclose the right to an injunction rests not only on estoppel. The doctrine may be applicable even though the aggrieved party be in ignorance of the violation of his rights. In other words, implied dedication to public use is not essential to the operation of the doctrine. Public policy in favor of a continuance of the public use may also be invoked to prevent a prohibitive injunction. *Peabody v. Vallejo* ... [40 P.2d 486, 497 (Cal. 1935)]. ...

*Hillside Water Co. v. City of Los Angeles,* 10 Cal. 2d 677, 688, 76 P.2d 681, 687 (1938). *Rank v. (Krug) United States, supra,* 142 F. Supp. at 136, synthesizes the two contrasting positions in the following manner:

> Aside from the public policy theory for denying injunctive relief where a public use has in fact attached, if the facts show an implied dedication to the public use by laches or an estoppel against the prior owner, it can be held on that basis that the prior owner's right to prohibitory relief is cut off. In such case the Court is really applying the equitable doctrine of implied dedication by estoppel, though it may be doing so in a situation where a public use has in fact attached.
>
> Where the facts do not show an implied dedication by estoppel, the Court is required to determine whether the public policy against inconvenient interruption of a water service on which the public has come to depend before suit, is offended. The doctrine of intervention of a public use is applicable *only* if one of the two theories, public policy or implied dedication, is satisfied by the facts of the particular case.

In considering the applicability of the public use doctrine or some form thereof to water rights actions in this jurisdiction, we begin with the clear recognition that the public interest is a relevant factor in deciding what remedy is proper for any wrong. *E.g., Life of the Land v. Ariyoshi,* 59 Haw. 156, 158, 577 P.2d 1116, 1118 (1978) (public interest one of three elements re propriety of temporary injunction of construction projects). However, thus far we have not

carried this principle a step further and adopted a doctrine such as that of intervention of a public use in water rights or other actions.

We are mindful of the competing goals that must be considered in deciding on the adoption of the public use doctrine in Hawaiian water law. On one hand, adoption of the doctrine, at least as strictly interpreted by some courts, would restrict the flexibility a court would otherwise have to fashion an equitable remedy in accordance with the facts and circumstances of each case.[20] On the other hand, it is also desirable that the public use of water, once that use has clearly attached, should be continued in order to avoid the harsh consequences of interruption.

With these objectives in mind, we adopt the public use doctrine with modifications to accommodate what we perceive are the competing interests. Thus, we hold that where water has been improperly diverted by a public entity[21] for actual public use,[22] a complainant may not obtain injunctive relief against the diversion of water to which a public use has attached at the time suit is filed, unless the court, applying and interpreting Hawaii's Constitution and relevant statutes, finds that another public interest of substantially the same magnitude as that of the public's interest in adequate water will be advanced by injunctive relief. Except as provided in the

---

[20] The desirability of flexibility may perhaps be best realized by emphasizing that the public interest almost never lies solely on one side of the balance of equities. Can it be said, for example, that there is no public interest in the continuation of small-scale taro farming? *See* Hawaii Const. art. XI, § 3. ("The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands.") Or can it be said that there is no public interest in a free-flowing stream for its own sake? *See* Hawaii Const. art. XI, § 1. ("For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty . . . .")

[21] While we restrict application of the doctrine to public entities, we do not foreclose the possibility that the doctrine might in appropriate circumstances apply to diversion by private parties.

[22] While we understand public use to mean the actual consumption of water by the general public, we do not foreclose the possibility that there may be other types of public uses to which the doctrine applies. Such as interpretation could, for example, follow from the definition, when given, of the term "beneficial and reasonable uses" of water by the water resources agency mandated by Hawaii Const. art. XI, § 7. ("The legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; *define beneficial and reasonable uses;* . . . ." *(Emphasis added.)*

next paragraph, a public use attaches at the time the water is actually used by the public and only to the extent of such actual use. With regard to public uses that attach after the complaint for improper diversion is filed, injunctive relief, as discussed above, normally remains a particularly appropriate remedy unless the court in exercising the inherent flexibility of equity, concludes that modified injunctive relief or another remedy is more appropriate. In the case of prior attachment, however, damages rather than injunctive relief would normally be the preferred remedy.[23]

The instant situation, as more fully described below, appears to call for a modification in the application of the doctrine. Here, there was a pattern of gradually increasing water diversion. Initially, the diversion caused plaintiffs no injury. At some point, however, the diversion began to harm plaintiffs, though they were still unaware that the harm was caused by the diversion. More time elapsed between that point and the filing of the complaint for improper diversion. On these facts, it is clear that the doctrine should not apply to create a heavy presumption against the award of injunctive relief after the complaint is filed. But neither do we think that the doctrine should apply to the period between the time when the diversion increased to a degree resulting in harm to complainants and the filing of the complaint. To so hold would in effect give public water entities carte blanche to divert water up to the filing of the complaint with knowledge that in almost all sitautions such diversion would not be enjoined. Concomitantly, it would pose a "Catch-22" situation for complainants; by the time they would be able to note the harm done by the diversion and file their complaint, they would be presented with a fait accompli. We therefore modify the doctrine to provide

---

[23] With regard to the proper measure of damages, the United States Supreme Court has stated:

> Damages [for injury to riparian rights] are to be measured by the difference in market value of the respondents' land before and after the interference or partial taking. As the Supreme Court of California said in *Collier v. Merced Irrigation District* . . . [*supra*, 2 P.2d at 797], ". . . [t]he riparian right is a part and parcel of the land in a legal sense, yet it is a usufructuary and intangible right inhering therein and neither a partial nor a complete taking produces a disfigurement of the physical property. The only way to measure the injury done by an invasion of this right is to ascertain the depreciation in market value of the physical property."

*Dugan v. Rank*, 372 U.S. 609, 624-25 (1963). To the same effect is *Elwood v. City of New York*, 450 F. Supp. 846, 874 (S.D.N.Y. 1978).

that where there is a gradually increasing diversion, the point at which the doctrine becomes operational is when the diversion causes harm to complainants, and not when the complaint is filed.[24] Thus, in such cases the doctrine would preclude an injunction against the diversion of waters applied to public use before actual harm ensued.

In applying the public use doctrine to this case, we first review the relevant facts. Until 1955, Waihee stream flowed in its natural state, and complainants and/or their predecessors farmed taro with irrigation water taken from (and substantially returned to) the stream. In 1955, BWS placed Waihee Tunnel into operation and over the next two decades gradually increased the amount of water diverted from the stream via the tunnel. In May 1974, BWS began to operate new wells ("Waihee I") which drew from a different source than the tunnel and which further diminished streamflow. In February 1977, BWS placed into operation a second new group of wells ("Waihee II") that drew substantially from still another source than those feeding the tunnel and Waihee I. With these three sources in operation, BWS had the capability of drying up Waihee Stream for at least portions of each year.

The gradual diminution of streamflow from 1955 on did not injure any of claimants' taro operations until 1975 when, as the trial judge found, claimant Wong experienced taro rot problems in his patches. The trial judge further found that claimant Hall experienced the same problem in 1976. The trial judge also found that "the existence of taro rot in Plaintiff's taro patches is related to decreased flow of water in Waihee Stream."

The farmers filed their complaint for declaratory and injunctive relief on December 7, 1976, after the tunnel and Waihee I became

---

[24] This assumes that the complainant is not chargeable with laches, estoppel or some other lack of diligence in bringing suit which precludes, independent of the public use doctrine, consideration of his action for injunctive relief. In noting this point, we dispose of the question, *supra*, whether a complainant's knowledge of the injury from improper diversion is a prerequisite to operation of the public use doctrine. We think it is not. A complainant's knowledge, either actual or imputed, is a key element in the operation of other doctrines which may preclude injunctive relief such as estoppel or laches. *See, e.g., Adair v. Hustace*, 64 Haw. 314, 640 P.2d 294 (1982) (latches is undue delay in prosecuting claim after actual or imputed knowledge of claim, which delay prejudices defendant). But it is not itself a relevant factor in operation of the public use doctrine.

operative but before that of Waihee II.[25] After issuing a preliminary injunction requiring BWS to leave 2.3 mgd in the stream at all times, which amount it later found was insufficient for plaintiffs' taro cultivation needs, the trial court on October 11, 1976 issued a permanent injunction requiring a 2.7 mgd minimum streamflow. According to the trial court, the amount represented a balance of the equities, one which would "allow the Board to adequately supply the demands of its windward customers without causing any damage to the Board's water sources, though it may have to call for conservation efforts by windward consumers . . . [,]" while still allowing some taro cultivation in Waihee Valley.

Therefore, in applying the doctrine the trial judge should first determine the time when the increasing diversion of Waihee streamwater first harmed the first claimant's taro cultivation. He should next determine what use was actually being made by the public of diverted streamwater just prior to that date. This amount will represent the amount of diversion which, under the public use doctrine, is not enjoinable. Diversion of the remaining water in Waihee Valley which would otherwise flow in Waihee stream may properly be enjoined.[26]

## SUMMARY

Our holdings as summarized are reiterated below:

1. Riparian rights.

    a. Water rights attaching to riparian lands by virtue of

---

[25] The facts in this case do not present a situation for application of the doctrines of laches or estoppel. While not essential to this conclusion, it is worth noting in this regard the January 31, 1972 recommendation of BWS's consultant on further development of Waihee water resources that "[p]ublicity be held to an absolute minimum . . . [because] land owners in the area are extraordinarily sensitive with respect to their water rights."

[26] We do not mean to restrict BWS in the facilities it uses to extract the water which it is not enjoined from extracting. BWS may use Waihee II if it is desired even though those wells were put into operation after the complaint was filed. Nor do we imply that a blanket injunction requiring BWS to leave a certain amount of water in the stream at all times during the year is necessarily the best remedy. There may have been regular periods during years prior to the time of injury to the first claimant during which public use was greater or less than the yearly average. The purpose of the public use doctrine is merely to ascertain and preserve the status quo with regard to the *public's use* of water once that use "attaches."

HRS § 7-1 cannot be severed or extinguished by a riparian landowner's grantor. The riparian rights of each plaintiff taro farmer were therefore unaffected by language in their deeds that purported to reserve such water rights.

b. Riparian landowners are entitled to make reasonable use of the quantity and flow of a natural watercourse and may prevent diversions that interfere with such use.

1) The agricultural activities of the plaintiffs taro farmers constitute a reasonable use of the waters of the Waihee stream as their mode of irrigation approximates that which has been historically utilized for the cultivation of taro. Plaintiffs are therefore entitled to the use of the waters of the Waihee stream for the cultivation of their riparian lands with the quantity and flow that existed prior to the reduction of the flow that contributed to the damaging of their crops.

2. Appurtenant rights.

a. Appurtenant water rights are incidents of the ownership of land which, by virtue of their appurtenant nature, may not be transferred or applied to lands other than those to which the rights appertain. They may, however, be extinguished by the grantor of such lands.

b. When the same parcels of land are being utilized to cultivate traditional products by means approximating those utilized at the time of the Mahele, there is sufficient evidence to establish a presumption that the amount of water diverted for such cultivation adequately approximates the quantity of the appurtenant water rights to which that land is entitled.

c. Plaintiffs' lands possessing appurtenant water rights that were not extinguished by their grantors are therefore entitled to the quantity and flow of water which was utilized to irrigate crops prior to the diminution of the stream that damaged the crops.

3. Enjoining of groundwater diversions that interfere with established streamflow rights.

a. Where surface and groundwater can be demonstrated to be interrelated as parts of a single system, established surface water rights may be protected against diversions that injure those rights whether the diversion is of surface water

or groundwater. BWS diversions that interfered with plaintiffs' established rights were therefore properly the subject of an injunction.

4. The propriety of injunctive relief against a "public use."

   a. As a general rule, where water has been improperly diverted by a public entity for actual public use, a complainant may not obtain injunctive relief against the diversion of water to which a public use has attached at the time the suit is filed, unless the court finds that a public interest of substantially the same magnitude will be advanced by injunctive relief.

      1) Where, however, there is a gradually increasing diversion, the critical point at which the doctrine becomes operational is when the diversion causes actual harm to the plaintiffs.

Reversed and remanded for further proceedings in accordance with this opinion.

*Samuel P. King, Jr.,* Special Deputy Corporation Counsel, *(Richard D. Wurdeman,* Corporation Counsel, with him on the briefs) for Defendant-Appellant, Cross-Appellee Board of Water Supply.

*Ronald Albu* (Legal Aid Society of Hawaii) for Plaintiffs-Appellees, Cross-Appellants Reppuns.

*E. Cooper Brown* for Plaintiffs-Appellees, Cross-Appellants Nakatas and Plaintiffs-Intervenors-Appellees, Cross-Appellants Wong and Hall.